**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| JAYHAWK CAPITAL MANAGEMENT, LLC, et al., | |
| *Plaintiffs,* | |
| vs. | Case No. 08-2561-EFM |
| LSB INDUSTRIES, INC., et al., | |
| *Defendants.* | |

## MEMORANDUM AND ORDER

The Jayhawk Group, a longtime major shareholder of Defendant LSB Industries, Inc., entered into a contract with LSB Industries, Inc. (LSB) in November of 2006. This November agreement limited the number of preferred shares in LSB that the Jayhawk Group could exchange for common shares if a tender offer occurred within one year of signing the agreement. The Jayhawk Group contends that they were fraudulently induced to enter into this agreement based on the misrepresentations of LSB's Chief Executive Officer, Jack Golsen.

In February 2007, LSB initiated a tender offer. Pursuant to the November agreement, Plaintiffs could only tender 52% of their Preferred Shares. In July 2007, Defendant attempted to redeem the remaining Preferred Shares, but Plaintiffs decided to convert their remaining preferred shares to common shares at a much lower exchange rate than the exchange rate in February, resulting in the loss of dividends in the amount of $4,069,065. Before the Court is Defendant Jack

Golsen's Motion to Dismiss (Doc.27) and Defendant LSB Industries' Motion to Dismiss (Doc. 29). For the following reasons, the Court denies the motions.

## I. Factual and Procedural Background

The following facts are taken from Plaintiffs' complaint. For the purpose of this motion, the Court assumes the truth of these facts. There are four Plaintiffs collectively known as either Plaintiffs or the Jayhawk Group. The Jayhawk Group were investment advisors and investment fund holders. The three corporate Plaintiffs are incorporated in Delaware, with their business facilities maintained in Kansas. The individual Plaintiff, Kent McCarthy, manager and sole controller of Jayhawk Capital, is a resident of Nevada whose business address is in Kansas. Defendant LSB is a publicly held company with its principal place of business in Oklahoma. Defendant Jack Golsen is the Chief Executive Officer of LSB and largest individual shareholder. He resides in Oklahoma City, Oklahoma.

Plaintiffs are long term investors in LSB, and they have held shares, both common and preferred, in LSB for years. The preferred shares owned by the Jayhawk Group are officially identified as LSB's "3.25 Convertible Exchangeable Class C Preferred Stock, Series 2" ("Preferred Shares" or "Preferred Stock"). The Preferred Shares were issued in 1993 following LSB's filing of the necessary Prospectus with the Security Exchange Commission ("SEC") on May 19, 1993. The Preferred Stock pays a dividend and that dividend is governed by the "Certificate of Designations of the $3.25 Convertible Exchange Class C Preferred Stock Series 2 of LSB Industries, Inc."

In June of 2006, Jayhawk Capital approached Defendants LSB and Golsen to convert their Preferred Shares into LSB common stock. At that time, the Jayhawk Group was the record and beneficial holder of 340,900 shares of Preferred Stock and also owned 1,124,700 shares of common

stock. Defendants never responded to the conversion proposal.

In late 2006, LSB conducted private exchanges for the conversion of Preferred Shares to shares of common stock for various holders at a ratio of 7.4 shares of common stock for every 1 share of Preferred Stock. In total, LSB issued 773,665 shares of common stock in exchange for 105,548 shares of Preferred Stock during the month of October. Defendants later informed the Jayhawk Group, the public, and the SEC that more than 150 individual holders of the Preferred Stock solicited Defendants for the conversions in October. Plaintiffs allege that Defendants approached the Preferred Shareholders, excluding the Jayhawk Group, about converting their Preferred Shares, rather than the individuals soliciting Defendant. The Jayhawk Group was not made aware of the conversion until after they were complete which they contend diluted their ownership interests without any notice. Plaintiffs allege that conversion of the Preferred Shares was favorable for LSB because it "cleaned-up" the balance sheet of the company, making ownership of the company easily ascertainable to prospective investors and eliminated the need to pay dividend obligations.

After the Jayhawk Group became aware of the October conversions, it again solicited Defendants to exchange their Preferred Shares. On October 19, 2006, Mike Schmitz, CFO of Jayhawk Capital, sent a letter to Golsen expressing the Jayhawk Group's interest in exchanging its Preferred Shares. Golsen had a conversation with Meredith Lang of the Jayhawk Group on November 1, 2006 where she told Golsen that the Jayhawk Group wanted to convert its Preferred Shares at a 7.4 to 1 ratio.

On November 2, 2006, Lang sent a follow up letter to Golsen explaining Jayhawk's desire to convert their shares like other Preferred Shareholders. Defendants refused, stating no conversions could take place until LSB's Form 10-Q was filed with the SEC on Monday, November 6, 2006. Defendants, including Golsen, told the Jayhawk Group that converting all of their Preferred Shares at a 7.4. to 1 ratio would jeopardize LSB's tax-loss carry forward under accounting rules. The Jayhawk Group was told that if it did not convert all of its shares, it would be helping LSB. The Jayhawk Group alleges that it later found out this reasoning was false and without support.

Based on the representation that conversion of all the Jayhawk Group's Preferred Shares would jeopardize LSB's tax-loss carry forward, the Jayhawk Group entered into an agreement with Defendants on November 10, 2006. This November agreement limited the Jayhawk Group's ability to convert all of their Preferred Stock into common stock. It also provided that if LSB undertook a tender offer for its issued and outstanding Preferred Shares or undertook to issue common stock for Preferred Stock in a private exchange within one year of executing the agreement, the Jayhawk Group would be limited to converting only 180,450 of its Preferred Shares (52.9% of its Preferred Shares). The conversion ratio set forth in the November agreement was 7.4 to 1 (common shares to Preferred Shares). LSB issued a press release on November 21, 2006 outlining the agreement.

The November agreement also altered various provisions in LSB's Articles of Incorporation, Certificate of Designation ("Certificate"). The Certificate filed with the SEC sets forth the rights, preferences, and designation of the Preferred Shares. Prior to the November agreement, the Certificate allowed LSB to redeem Preferred Shares at $50 per share plus the amount of accrued and unpaid dividends and also provided that LSB could not redeem less than all of the Preferred Shares without paying accrued and unpaid dividends absent the consent of two-thirds of the outstanding

Preferred Shareholders.

At the time of the November agreement, there were 499,102 Preferred Shares of LSB outstanding. The Jayhawk Group owned 340,900, or 68.3% of the shares. Once the Jayhawk Group had the requisite two-thirds ownership of outstanding Preferred Shares, it was necessary for the Defendants to have the Jayhawk Group vote to amend the Certificate so as to remove the requirement that precluded LSB from purchasing, redeeming, or acquiring LSB common stock unless all accrued and outstanding dividends paid. The November agreement between Plaintiffs and Defendants allowed LSB to make a partial redemption of the Preferred Shares.

The November Agreement also stated that "the Jayhawk Group acknowledge and agree that [LSB], as of the date of this Agreement [November 10, 2006], has not determined to undertake any tender offer for the Series 2 Preferred." After the agreement was executed, Plaintiffs state that they discovered that this was not true. Plaintiffs learned that Golsen had informed another Preferred Shareholder in late March 2006 that LSB was offering an exchange rate of 7.25 common shares for every 1 share of Preferred Stock. Plaintiffs also allege that they discovered that the business plan for LSB was, in fact, to eliminate all Preferred Shares, and this was the plan at the time the November Agreement was executed.

Plaintiffs believed the November agreement was in their best interest. Plaintiffs assert that they entered into the November agreement believing they were getting something with the agreement that they would not have otherwise received: conversion of at least some of their Preferred Shares to common shares. McCarthy and Golsen had repeated conversations about LSB's tax-loss carry forward during October and November 2006. On November 11, 2006, Lang sent a letter to Tony Shelby, LSB's CFO that stated "It was our understanding when we reached our

agreement with you for the exchange of our Series 2 Preferred Stock for Common Stock that you were restrained from converting all of our Preferred Stock because of tax and NOL concerns. As you know, we would really have liked to convert all of our shares."

On November 30, 2006, Lang sent another letter to Shelby regarding the tax-loss representation. In this letter, she stated "we converted 52.93% of our shares in LSB, but would really have liked to convert it all. Earlier you indicated concerns regarding change in ownership and tax losses were the primary considerations for LSB during our negotiations. We certainly appreciate these concerns and have no interest in upsetting the financial success of LSB. However, our accountants still cannot reach the same conclusion as your accountants with regard to the above concerns."

Lang sent a third letter to Shelby on December 14, 2006. It states in part "[a]s you know, we began these negotiations in the summer. Kent went to both the Board of Directors and to company Executives to request the same conversion of Jayhawk shares as was given to other Series 2 Preferred holders. Negotiations initiated with other Preferred shareholders were completed and they were fully redeemed. Meanwhile, Jayhawk is still waiting for any action by the company with respect to the Jayhawk Series 2 Preferred shares. We have sent three previous letters regarding our understanding of the tax loss situation. Most recently we indicated our desire to visit with your accountants on this issue, in order to resolve our understanding. Throughout our negotiation, you and Jack continually indicated that tax loss concerns were your primary consideration in limiting us to a conversion of less than all of our Preferred shares. Should this not be the case, we would expect a full redemption." LSB and Golsen never responded to these requests. Plaintiffs state that they believed the tax-loss carry over statement was true and actually purchased additional Preferred

Shares in December 2006 and January 2007.

On February 9, 2007, LSB commenced a tender offer to exchange Preferred Shares into common shares at a 7.4 to 1 ratio. The Jayhawk Group, because of the November agreement, tendered only 180,450 of its Preferred Shares. If all of the Jayhawk Group's Preferred Shares would have been converted at a 7.4 to 1 ratio, they would have obtained an additional 2,565,298 shares of common stock bringing their beneficial ownership in LSB to just over 20%.

On March 2, 2007, Mike Schmitz, an officer of Jayhawk Capital, had a conversation with Heidi Brown, the managing counsel for LSB, in which he reiterated the need for information about Defendants' tax-loss carry forward statement. On March 3, 2007, Schmitz wrote Brown a letter. It stated in part that "[a]t the time we reached our agreement last November, we agreed to convert less than our full amount because we were told it would place the company's tax loss carryforwards in jeopardy. At the time the agreement was negotiated (and several times since then), we asked for an explanation of how converting all of our shares would have done this, but no one was able to take the time to answer our questions."

Brown responded on March 15, 2007 stating in part: "Jack's discussion with Kent regarding the reasons for LSB's wanting to limit the number of Jayhawk Group preferred shares that would participate in the tender included reference to concerns relating to bank relationships, sale contracts, and the possibility on an effect on LSB's NOL [net operating loss]. . . . ." The letter also stated that "[t]here was no representation that there would in fact be an effect on LSB's NOL." Plaintiffs state that this statement is false because Plaintiffs were told that the tax-loss carry forward would be adversely affected.

On July 11, 2007, LSB opted to redeem all remaining Preferred Shares. The terms of redemption were $50 per share plus $26.25 per share in accrued dividends. The Jayhawk Group, pursuant to its rights under the Certificate, exercised their right to convert their Preferred Shares into common shares at a ratio of 4.329 to 1. The conversion ratio was far less than the 7.4 to 1 conversion ratio offered to the other Preferred Shareholders in the February 2007 tender offer. Plaintiffs alleged that its ownership interest in LSB was severely diluted as to what it would have been had they received the 7.4 to 1 conversion ratio. Plaintiffs also contend that LSB did not pay the Jayhawk Group the accrued and previously declared dividends pursuant to the Certificate, amounting to $4,069,065.

The Certificate of Designations establishes the rights of all Preferred Shareholders. Plaintiffs contend that a copy of the Certificate was required to be filed every year as an exhibit to LSB's annual 10-K filing with the SEC. LSB filed the Certificate for the first time in 1993 and did not file it again until March of 2007. Plaintiffs assert that this is evidence of LSB's reckless behavior.

Plaintiffs filed a complaint in November of 2008 which Defendants filed motions to dismiss. In response, Plaintiffs filed an Amended Complaint.[1] Plaintiffs' Amended Complaint alleges six causes of action: (1) fraudulent inducement; (2) fraud; (3) violation of § 10(b) of the Securities and Exchange Act of 1934 and Regulation 10b-5; (4) violation of the Kansas Uniform Securities Act, K.S.A. § 17-12A501; (5) breach of fiduciary duty; and (6) breach of contract. All claims are brought against Defendant LSB, while only fraudulent inducement, fraud, and breach of fiduciary duty are brought against Golsen.

---

[1]Plaintiffs never filed for Leave to File an Amended Complaint, but Defendants did not object and instead filed a Motion to Dismiss the Amended Complaint.

Defendants seek to dismiss all claims and have filed separate motions. Defendant LSB seeks to dismiss the claims against it on the basis that Plaintiffs have failed to state a cause of action under Federal Rules of Civil Procedure 12(b)(6) and 9(b). In addition, Defendant LSB contends that should the Court dismiss the federal law claim, it should decline to exercise supplemental jurisdiction and dismiss the remaining state law claims. Defendant Golsen seeks dismissal on the same bases and additionally because the Court lacks personal jurisdiction and subject matter jurisdiction.

## II. Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'"[2] "[T]he mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complaint must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims."[3] "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."[4]

In determining whether a claim is facially plausible, the court must draw on its judicial experience and common sense.[5] All well pleaded facts in the complaint are assumed to be true and

---

[2] *Ashcroft v. Iqbal*, - - - U.S. - - -, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

[3] *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

[4] *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003).

[5] *Iqbal*, 129 S.Ct. at 1950.

are viewed in the light most favorable to the plaintiff.[6]  Allegations that merely state legal conclusions, however, need not be accepted as true.[7]

## III. Analysis

Plaintiffs bring six causes of action: (1) fraudulent inducement; (2) fraud; (3) violation of § 10(b) of the Securities and Exchange Act of 1934 and Regulation 10b-5; (4) violation of the Kansas Uniform Securities Act, K.S.A. § 17-12A501; (5) breach of fiduciary duty; and (6) breach of contract.  The Court will address Plaintiffs' 10b-5 claim brought against Defendant LSB first as the disposition of this claim impacts the Court's analysis on the remaining claims and Defendant Golsen's motion to dismiss.

### Section 10b-5 Claim

In the context of securities fraud, plaintiffs are held to a higher standard of pleading.[8] To state a claim under Rule 10b-5 for securities fraud, plaintiff's complaint must allege that: "(1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance."[9]

---

[6]*See Zinermon v. Burch*, 494 U.S. 113, 118 (1990); *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984).

[7]*See Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).

[8]*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007); *see also Pirraglia v. Novell, Inc.*, 339 F.3d 1182, 1186 (10th Cir. 2003).

[9]*Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1095 (10th Cir. 2003).

In 1995, Congress passed the Private Securities Litigation Reform Act ("PSLRA").[10] "The purpose of the PSLRA was to curb perceived abuses in the prosecution of private securities fraud lawsuits . . . ."[11] The PSLRA did not add to the five elements required to make up a 10b-5 cause of action but instead strengthened what is required to adequately plead two of the elements.[12]

The PSLRA increased the burden on the first element, i.e., the allegation that the defendant made a false or misleading statement or failed to state a material fact necessary to make statements not misleading.[13] Plaintiff must specifically state in the complaint "each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed."[14] With regard to this requirement, the Tenth Circuit has stated that "in evaluating the misleading-statement provision of the Reform Act, to the extent that reasonable inferences can be drawn in the plaintiffs' favor without violating the strictures of the Reform Act, we will continue do so."[15]

In addition, "the PSLRA heightened the standard for pleading the scienter element of a securities fraud claim."[16] "Under Rule 9(b), "[m]alice, intent, knowledge, and other conditions of

---

[10]*See* Private Securities Litigation Reform Act of 1995, Pub. L. No. 104-67, 109 Stat 737.

[11]*Adams*, 340 F.3d at 1095.

[12]*Id.*

[13]*Id.*

[14]15 U.S.C. § 78u-4(b)(1).

[15]*Pirraglia*, 339 F.3d at 1188.

[16]*Adams*, 340 F.3d at 1095-96.

mind may be averred generally."[17] The PSLRA, however, requires plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."[18]

In *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, the United States Supreme Court set forth what a plaintiff is required to allege to sufficiently plead a "strong inference" of scienter.[19] The District of Kansas recently explained the requirements set forth in *Tellabs*.[20]

> In prescribing a "workable construction" of the "strong inference" pleading standard, the Court first reiterated that a district court faced with a Rule 12(b)(6) motion to dismiss a section 10(b) action must accept all factual allegations in the complaint as true. Second, the Court admonished that district courts must consider the complaint in its entirety and that the appropriate inquiry is whether "*all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." Ultimately, the Court held that in determining whether the pleaded facts give rise to a strong inference of scienter, the district court "must take into account plausible opposing inferences" rationally drawn from the facts alleged and must engage in a "comparative evaluation" of those inferences. "To qualify as 'strong' within the intendment of § 21D(b)(2) ... an inference of scienter must be more than merely plausible or reasonable-it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." Stated another way, "[a] complaint will survive ... only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged."[21]

---

[17]*Id*. at 1096.

[18]15 U.S.C. § 78u-4(b)(2).

[19]*Tellabs*, 551 U.S. at 322-24.

[20]*New Jersey v. Sprint Corp.*, 531 F. Supp. 2d 1273 (D. Kan. 2008).

[21]*Id*. at 1279-80 (internal citations omitted). The Court noted that "the standard for pleading scienter as articulated by the Tenth Circuit in *Pirraglia* is substantially similar to the standard adopted by the Court in *Tellabs*." *Id*. at 1281. However, the Tenth Circuit had left "open the possibility that an inference of scienter could be deemed sufficiently 'strong' to survive a motion to dismiss even if an innocent inference tips the scales ever so slightly." *Id*. (citing *Pirraglia*, 339 F.3d at 1188). The *Tellabs* court raised the pleading standard in this regard and required a comparative evaluation of all inferences permitted in the complaint. *Id*. Essentially, the draw goes to the plaintiff when there are equally strong inferences against and for scienter. *Id*.

Defendant asserts that Plaintiffs' 10b-5 claim should be dismissed because (1) Plaintiffs lack standing to assert a 10b-5 claim because the securities transaction it complains about does not involve a purchase or sale; (2) the allegedly false statements are not actionable as a matter of law; (3) Plaintiffs do not plead specific, particularized facts giving rise to a "cogent and compelling" inference of scienter, and (4) Plaintiffs' allegations fail to meet the heightened pleading standards mandated by Federal Rule of Civil Procedure 9(b) and the PSLRA.

### 1. Standing

Defendant asserts that Plaintiffs' claim should be dismissed because Plaintiffs do not have standing because their claim is premised on a transaction, the inability to exchange all of their Preferred Shares in the February 2007 tender offer, that does not involve a purchase or sale. Plaintiffs contend that Defendant is taking too narrow of a view of the Complaint, and they do have standing because their complaint states that they both purchased and sold Preferred Stock on the basis of Defendant's misrepresentations.

Only actual purchasers or sellers of securities, or those with a contractual right to purchase or sell a security, have standing to bring a private cause of action for a 10b-5 violation.[22] This is a judicially created requirement, and in deciding the issue, the Supreme Court ruled that there are three classes of potential plaintiffs barred from bringing 10b-5 claims.[23] These include: (1) potential purchasers of shares who allege they decided not to purchase because of a representation; (2) actual

---

[22]*Blue Chips Stamps v. Manor Drug Stores*, 421 U.S. 723, 737, 750-51 (1975); *Grubb v. FDIC*, 868 F.2d 1151, 1159 (10th Cir. 1989). Section 10(b) provides that it shall be unlawful for any person "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78(j(b).

[23]*Blue Chip Stamps*, 421 U.S. at 737-38.

shareholders who allege they did not sell because of a representation; and (3) shareholders, creditors, and others who suffered a loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale that violates Rule 10b-5.[24]

In crafting this standing rule, the Supreme Court relied primarily on "policy considerations."[25] The *Blue Chip Stamps* Court "feared that mere bystanders to a transaction could 'await developments on the sidelines without risk' and, if unhappy with the results, initiate 'strike' or nuisance suits . . . ."[26] Some courts have applied *Blue Chip Stamps* to preclude recovery for plaintiffs who allege they were induced to hold their shares rather than sell them. "There is no private right of action under Rule 10b-5 for mere holders of securities."[27]

However, the meaning of the phrase "in connection with the purchase or sale of any security" has been interpreted broadly.[28] The statute defines "purchase" or "sale" of securities broadly.[29] At least one court has determined that the conversion of stock from preferred to common pursuant to a settlement agreement amounted to a transaction falling within the purchase or sale requirement of Rule 10b-5.[30]

---

[24]*Id.*

[25]*Id.*; *see also Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 80 (2006); *Grubb*, 868 F.2d at 1161.

[26]*Grubb*, 868 F.2d at 1161 (citing *Blue Chip Stamps*, 421 U.S. at 746-47, 95).

[27]*Winer Family Trust v. Queen*, 503 F.3d 319, 325 (3d Cir. 2007).

[28]*SEC v. Zandford*, 535 U.S. 813, 819 (2002).

[29]*See* 15 U.S.C. § 78c(13)-(14). "The terms 'buy' and 'purchase' each include any contract to buy, purchase, or otherwise acquire. For security futures products, such term includes any contract, agreement, or transaction for future delivery." 15 U.S.C. § 78c(13). "The terms 'sale' and 'sell' each include any contract to sell or otherwise dispose of. For security futures products, such term includes any contract, agreement, or transaction for future delivery." 15 U.S.C. § 78c(14).

[30]*FS Photo, Inc. v. PictureVision, Inc.*, 61 F. Supp. 2d 473, 478 (E.D. Va. 1999).

In *Grubb v. FDIC*, the Tenth Circuit found that although plaintiff was not the "technical" purchaser or seller of securities, he was the "actual" purchaser because he was the guarantor of the note that purchased the securities.[31] In deciding the issue, the Tenth Circuit stated that "[c]ourts should read Rule 10b-5 flexibly, not technically."[32] "The remedial purpose of the rule should not be defeated by taking a technical, unrealistic view of what happened in a case."[33]

*Purchase*

In Plaintiffs' complaint, Plaintiffs state that they believed Defendant's tax-loss carry over statement was true and purchased additional Preferred Shares raising their ownership interest to 69.5%. They also state that their decision to purchase additional shares and their decision to ultimately convert the remainder of the Preferred Shares was done as a result of Defendant's false and misleading statements. Defendant contends that Plaintiffs' theory that the misrepresentations causing Plaintiffs to enter into the November Agreement resulting in Plaintiffs buying additional shares is implausible and fails to state a claim. However, taking the facts in the Complaint as true, as the Court must at this stage, Plaintiffs' complaint alleges that it was a purchaser of securities based on Defendant's misrepresentations. Plaintiffs allege the underlying facts and sets forth the alleged misrepresentations specifically in the Complaint. Although the evidence may ultimately demonstrate that there is no causal connection between the misrepresentation and the purchase, Plaintiffs' complaint is sufficient to provide Plaintiffs with standing as a purchaser at this stage.

---

[31]*Grubb*, 868 F.2d at 1161-62.

[32]*Id.* at 1162 (citations omitted).

[33]*Id.*

*Sale*

Plaintiffs also state that they have standing because they sold their Preferred Shares in reliance on Defendant's misrepresentations. Plaintiffs state that there are two instances when they sold their Preferred Shares on Defendant's misrepresentations. The first instance was the partial participation in the February 2007 tender offer, and the second instance was when they later converted the remainder of their Preferred Shares in July 2007. Defendant contends that Plaintiffs' damages stem from the inability to convert all of their shares in the February 2007 tender offer; therefore, Plaintiffs' claim is premised on the inability to sell securities, not on the sale of securities. Defendant also asserts that Plaintiffs' allegation that their July 2007 conversion was based on Defendant's fraudulent statements is not supported by facts and is not actionable because it is based on a delay in selling securities.

With regard to the February 2007 tender offer, while Defendant contends that it is irrelevant that Plaintiffs tendered a portion of their Preferred Shares in the February 2007 tender offer, the Court does not so find. Defendant's approach to the transaction is unrealistically technical and attempts to split the transaction into two parts.[34] In looking at the February 2007 transaction as a whole, it involved a sale of securities. Although it is true that courts have found that mere holders of securities do not have a cause of action, it does not appear that Plaintiffs were merely holders of

_____

[34]Defendant relies on *Lawrence v. Cohn*, 325 F.3d 141 (2d Cir. 2003), for the proposition that the Second Circuit found that plaintiffs did not have standing under Rule 10b-5 on the basis of a fraudulently induced agreement in which they surrendered their right to purchase securities. The case is distinguishable. First, it was decided after discovery and at summary judgment stage. The district court had previously *denied* defendant's motion to dismiss "holding that plaintiffs *had standing* to bring a securities fraud claim and that plaintiffs' complaint had stated a viable claim upon which relief could be granted." *Id.* at 146-47. When the district court did ultimately grant summary judgment in defendant's favor, the Second Circuit affirmed the district court on the basis that plaintiffs had failed to establish they were entitled to purchase the interest and therefore lacked standing. *Id.* at 149-54. In addressing the issue of the fraudulent agreement, the Second Circuit found that the argument failed because plaintiffs could not establish a causal connection between that purchase and the harm they suffered. *Id.* at 154. At this stage, the Court must rely on the pleadings and take the factual statements in Plaintiff's complaint as true.

securities. Plaintiffs actively attempted to convert all of their Preferred Shares prior to entering into the November agreement with Defendant. Plaintiffs state that they were induced to enter the agreement because of Defendant's misrepresentations and only entered into the agreement because they believed that they were getting something that they would otherwise not receive - conversion of at least a portion of their Preferred Shares. The November agreement precluded Plaintiffs from tendering all of their Preferred Shares when the tender offer occurred in February of 2007. In February of 2007, Plaintiffs sold a portion of their shares by redeeming their Preferred Shares for common shares. Looking at the transaction realistically and as a whole, it involved the sale of securities. The Court concludes that Plaintiffs have pled sufficient facts to give them standing as a seller of securities.[35]

### 2. Misleading and False Statements

Plaintiffs must set forth all allegedly misleading statements and the reasons why those statements are misleading.[36] Plaintiffs allege three false statements: (1) Defendant told Plaintiffs that converting all of their Preferred Shares at a 7.4 to 1 ratio would jeopardize Defendant's tax-loss carry forward under accounting rules and if they did not convert all of their shares, they would be helping Defendant; (2) Defendant told Plaintiffs, the public, and the SEC that the conversions that took place in October 2006 were due to the fact that more than 150 individual holders of the Preferred Stock solicited Defendant for the conversions; and (3) Defendant, as of the date of the November 10, 2006 Agreement, had not determined to undertake any tender offer for the Series 2 Preferred. Defendant asserts that the allegedly false statements are not actionable as a matter of law.

---

[35]The Court finds it unnecessary to address whether the July 2007 conversion constitutes a sale because it has already found that Plaintiffs were both a purchaser and seller.

[36]*Pirraglia*, 339 F.3d at 1188; 15 U.S.C. § 78u-4(b)(1).

*a. Tax-Loss Carry Over*

Plaintiffs allege that Defendant told Plaintiffs that converting all of their Preferred Shares at a 7.4 to 1 ratio would jeopardize Defendant's tax-loss carry forward under accounting rules and if they did not convert all of their shares, they would be helping Defendant. Defendant contends that Plaintiffs selectively quote in their complaint a portion of an email exchange regarding the representation of the tax-loss carry forward, and the portion that Plaintiffs do not quote establishes that Defendant did not make the alleged misrepresentation. Therefore, Defendant asserts that the statement is not actionable.

Defendant attached a copy of the complete email exchange to its motion to dismiss. "[N]otwithstanding the usual rule that a court should consider no evidence beyond the pleadings on a 12(b)(6) motion to dismiss, the district court may consider documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the document's authenticity."[37] The email exchange Defendant attached to the complaint consists of three emails spanning several days. Plaintiffs reference and quote two of the three emails in their complaint in alleging that Plaintiffs requested support for the tax-loss carry forward representation. Plaintiffs also referenced the specific email in its responsive briefing. As it is referred to in the complaint and is central to the plaintiffs' claim, the Court will consider the exchange without converting the motion to one for summary judgment.

---

[37]*Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215-16. (10th Cir. 2007) (internal citations and quotations omitted).

The portion of the email that Defendant provides that was not quoted in the complaint is language from Mike Schmitz, an officer of Plaintiff Jayhawk Capital, which states: "I understand that LSB did not represent that there would be an effect on their NOL, I only indicated that LSB represented that the NOLs could be in jeopardy if the Jayhawk Group converted all their shares, which you appear to agree with." Throughout the complaint, however, Plaintiffs allege that Defendant told them that converting all of their Preferred Shares would jeopardize Defendant's tax-loss carry forward. Defendant contends that the March 2007 email string establishes as a matter of law that the alleged misrepresentation was not made. The Court cannot so find. This email string occurred in March of 2007 between Schmitz, an officer of Jayhawk Capital, and Brown, managing counsel for LSB. Although it may establish that Schmitz informed Brown that *he* understood that LSB did not represent that there would be an effect on their NOL, it does not establish conclusively that Defendant did not make the alleged misrepresentation to Plaintiffs.

Plaintiffs have numerous allegations throughout the complaint regarding the tax-loss carry forward statements prior to the email exchange in March of 2007, and they have alleged specifically that Golsen told the Jayhawk Group that converting all of their Preferred Shares at a 7.4. to 1 ratio would jeopardize LSB's tax-loss carry forward under accounting rules. At the motion to dismiss stage, the Court is hesitant to rely on one word in an email to determine as a matter of law that Defendant did not make the alleged statement. The Court's job is not to determine whether the statement was actually made but whether Plaintiffs have adequately alleged the misleading statement. Assuming that the facts as stated are true, Plaintiffs have set forth the misleading statement.

Under the PSLRA, Plaintiffs are held to a higher pleading standard.[38] It is a statutory requirement that Plaintiffs set forth the reason or reasons why the statement is misleading.[39] In *Adams*, the Tenth Circuit determined that the complaint was sufficient because it set forth the allegedly misleading statements *and* the reasons why the statements were claimed to be misleading.[40] Specifically, the Tenth Circuit found with regard to the complaint stating that the defendant's financial statements were not prepared according to GAAP principles, the complaint set forth the fundamental principles of GAAP and set forth that the defendant did not follow that GAAP principle because it booked income for services that it had not yet delivered.[41]

Plaintiffs have set forth the reasons as to why the statement is misleading. Plaintiffs have alleged and cited to several letters in which Plaintiffs stated that their accountants could not reach the same conclusion as Defendant's accountants with regard to how Defendant's tax-loss carry forward would be impacted by Plaintiffs' redemption of all Preferred Shares. Furthermore, the fact that Defendant did not provide support for the tax-loss statement, despite repeatedly being asked, is additional support that Plaintiffs have adequately alleged why Defendant's tax-loss carry forward statement was false. Viewing the complaint in the light most favorable to Plaintiff and assuming the facts as stated to be true, the Court finds that Plaintiffs have adequately alleged the misleading statement with regard to the tax-loss carry forward.

---

[38]*Adams*, 340 F.3d at 1095.

[39]15 U.S.C. § 78u-4(b)(1).

[40]*Adams*, 340 F.3d at 1096.

[41]*Id.* at 1096-97; *see also Pirraglia*, 339 F.3d at 1190 (finding that "plaintiffs have specified the statements alleged to be misleading and the reasons why they are misleading.")

*b. October 2006 Conversions*

The second statement that Plaintiffs allege was misleading is Defendant told Plaintiffs, the public, and the SEC that the conversions that took place in October 2006 occurred because more than 150 individual holders of the Preferred Stock solicited Defendant for the conversion. Plaintiffs allege that this was false because Defendant actually approached Preferred shareholders, excluding Plaintiffs, to convert their Preferred Shares to common shares. Defendant contends that it is immaterial who approached whom, and therefore, the alleged representation cannot be the basis of a 10b-5 claim.

"'A statement or omission is only material if a reasonable investor would consider it important in determining whether to buy or sell stock,' and if it would have 'significantly altered the total mix of information available' to current and potential investors."[42] Materiality, however, is generally a fact-specific inquiry.[43] Courts, however, do not hesitate to dismiss securities claims where the representation is plainly immaterial.[44]

To assess the materiality of the statement, the Court must consider the context.[45] Plaintiffs contend that the representations were material because they wanted to know if their ownership rights were being diluted by stock conversions of other shareholders and had they known that Defendants were intentionally diluting Plaintiffs' ownership, they would not have believed anything else Defendants were peddling.

---

[42]*City of Philadelphia v. Fleming Cos., Inc.*, 264 F.3d 1245, 1265 (10th Cir. 2001) (citing *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1119 (10th Cir. 1997)).

[43]*Grossman*, 120 F.3d at 1118.

[44]*Id.*

[45]*Id.* at 1121.

The Court fails to see how Plaintiffs' knowledge of who approached whom is material or significantly altered the total mix of information. Whether or not individual shareholders sold their Preferred Shares in response to Defendant's solicitation does not appear to be a factor impacting Plaintiffs' decision to sell or purchase Preferred Shares. Plaintiffs allege that they sought to convert all of their Preferred Shares as early as June of 2006. This is prior to the alleged misleading statement regarding the October of 2005 conversions. Plaintiffs allege that once they became aware of the October conversions, they approached Defendant again to exchange their Preferred Shares. Had Plaintiffs known that Defendants solicited the individual shareholders rather than the individual shareholders approaching Defendant would not have changed Plaintiffs' decision to redeem their Preferred Shares. Plaintiffs' redemption would have occurred regardless of whether individual investors approached Defendant or whether Defendant approached the individual investors. As such, the Court concludes that the October conversion statement is immaterial and cannot be a basis for Plaintiffs' 10b-5 claim.

*c. Future Tender Offer*

Plaintiffs allege that the November agreement states "the Jayhawk Group acknowledge and agree that the Company [LSB], as of the date of this Agreement [November 10, 2006], has not determined to undertake any tender offer for the Series 2 Preferred." Plaintiffs contend that this is misleading because after the agreement was executed, Plaintiffs learned that Defendant had informed another Preferred Shareholder in March of 2006 that Defendant was offering an exchange rate of 7.25 common shares for every 1 share of Preferred Stock, and the October conversions solicited by Defendant revealed Defendant's intent to eliminate Preferred Shares. In addition, Plaintiffs contend that Defendant's business plan was to eliminate all Preferred Shares and this was

in place at the time the November agreement was executed.

Defendant asserts that the statement is not actionable as a matter of law because it is not a false statement. Attaching the November agreement to its motion to dismiss, Defendant asserts that the November agreement never disclaims a future tender offer, but merely states that it had not determined at that time whether there would be a future tender offer. Plaintiffs contend that had it known of Defendant's plan to convert or eliminate all outstanding Preferred Shares one way or another, it would not have entered into the November agreement limiting its ability to convert its Preferred Shares.

With regard to this issue, it appears as if Defendant is asking the Court to determine whether the alleged misleading statement in the November agreement was not false, as a matter of law, rather than whether Plaintiffs have alleged a false statement. At the pleading stage, the Court is considering the sufficiency of the pleadings and not whether the pleadings are true. Indeed, the Court has to assume the pleadings to be true when deciding a motion to dismiss. As such, the Court finds that Plaintiffs have sufficiently alleged a misleading statement and the reasons as to why the statement is misleading with regard to the future tender offer.

### 3. Scienter

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud."[46] As stated above, there are several principles the Court must adhere to in determining whether Plaintiffs have adequately alleged the scienter element. First, the Court must take all factual allegations as true.[47] Second, the Court must consider the complaint in its entirety and not scrutinize individual

---

[46]*Tellabs*, 551 U.S. at 319 (citing *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193-94, and n.12 (1976)).

[47]*Sprint Corp.*, 531 F. Supp. 2d at 1280-81 (citations omitted).

allegations.[48]  Finally, the Court must engage in a comparative evaluation of plausible opposing inferences rationally drawn from the facts alleged.[49]  To qualify as a "strong" inference that Defendant acted with the required scienter means that the inference must be more than merely plausible or reasonable, it must be cogent and at least as compelling as an opposing inference of nonfraudulent intent.[50]

"The inquiry is inherently comparative: How likely is it that one conclusion, as compared to others, follows from the underlying facts?"[51]  "The inference that the defendant acted with scienter need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'"[52]  At this stage, it is not the Court's job to "evaluate the accuracy of plaintiffs' well-pleaded facts; the only questions are whether plaintiffs satisfy the [PSLRA] pleading requirements and whether the facts, if true, give rise to a strong inference of scienter under the securities laws."[53]  The Court must answer the question: "When the allegations are accepted as true and taken collectively, would a reasonable person deem the inference of scienter at least as strong as an opposing reference?"[54]

The Court only considers allegations of scienter with regard to the statements that have satisfied the first element of the PSLRA, i.e., the statements alleged to be misleading and the reasons

---

[48]*Id*. at 1081.

[49]*Id*.

[50]*Id.*

[51]*Tellabs*, 551 U.S. at 323.

[52]*Tellabs*, 551 U.S. at 324 (citations omitted).

[53]*Pirraglia*, 339 F.3d at 1194.

[54]*Tellabs*, 551 U.S. at 326.

why they are misleading.[55]  In this case, Plaintiffs alleged three misleading statements, but the Court

has determined that only two are actionable.  The Court is mindful, however, that it must look at the

complaint as a whole in determining whether Defendant acted with scienter.

Defendant contends that Plaintiffs have not pled specific, particularized facts giving rise to

a cogent and compelling inference of scienter.  Specifically, Defendant contends that (1) legitimate

business motives are insufficient to establish scienter as a matter of law; (2) LSB's failure to file its

Certificates for the Preferred Shares as an exhibit to its annual 10-K filings with the SEC is not

reckless; (3) Plaintiffs fail to plead that any individuals at LSB acted with scienter; and (4) Plaintiffs'

allegations fall short when the complaint is considered its entirety.

*Legitimate business motives*

Defendant asserts that Plaintiffs attempt to prove scienter on three allegations of motive: (1)

conversion of the Preferred Shares cleaned up the balance sheet of Defendant; (2) conversion of the

Preferred Shares eliminated the need to pay dividend obligations; and (3) the November agreement

was designed to dilute Plaintiffs' ownership interest in Defendant.  Defendant contends that the only

reasonable inference from the pleaded facts is that Defendant sought to limit Plaintiffs' conversion

of Preferred Shares into common shares because it wanted to clean up its balance sheet and reduce

its dividend obligations without excessively diluting its common shareholders. It argues that this a

legitimate business motive that does not give rise to a cogent and compelling inference of scienter.

Plaintiffs argue that Defendant's false representations were intentionally done to avoid paying

dividends owed to Plaintiffs, to dilute Plaintiffs' ownership interest, and to solidify the majority

---

[55]*Pirraglia*, 339 F.3d at 1190-91; *see also* 15 U.S.C. § 78u-4(b)(2) ("the complaint shall, with respect to
each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that
the defendant acted with the required state of mind.")

ownership interest of Defendant Golsen.

Plaintiffs also assert that the intentional misrepresentations are supported by at least two motives. Motive and opportunity are insufficient by themselves to establish scienter, but they may be important in considering the complaint as a whole.[56] "Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged."[57]

First, Plaintiffs allege that Defendant wanted to redeem Preferred Shares without paying costly dividends. Under the Certificate, Defendant could not redeem less than all Preferred Shares without paying accrued and unpaid dividends unless it had the approval of two-thirds of the outstanding Preferred Shareholders. Plaintiffs alleged that they owned more than two-thirds of the outstanding Preferred Shares. By entering into the November agreement, Defendant limited Plaintiffs' ability to convert all of their Preferred Shares and eliminated Defendant's need to obtain Plaintiffs' approval that Defendant could not redeem less than all Preferred Shares without paying dividends. The second alleged motive was to dilute ownership interests of Plaintiffs in relation to Golsen and other shareholders. Plaintiffs assert that Golsen and his family members now retain the largest ownership interest.

While Defendant contends that the only inference from the alleged facts is an innocent one, a legitimate business reason, there is also a competing inference. As Plaintiffs have stated, there is another inference that Defendant's misrepresentations were done in an effort to avoid paying dividends, dilute Plaintiffs' ownership, and solidify the majority interest in Defendant Golsen, CEO of Defendant. Both inferences are warranted and appear to be comparatively equal. Plaintiffs'

---

[56]*Pirraglia*, 339 F.3d at 1191.

[57]*Fleming*, 264 F.3d at 1261.

inference of scienter need not be the most plausible, but it must be cogent and at least as compelling as Defendants' legitimate business reason. Here, the Court finds that Plaintiffs have sufficiently stated facts to support a fraudulent inference at least as compelling as Defendant's legitimate business reason.

*Recklessness*

Plaintiffs contend that Defendant acted recklessly because it did not file its Certificate of Designation each year with its annual 10-K filing with the SEC as required, and Defendants repeated tax-loss statements were at least reckless because Defendant never provided support although Plaintiffs asked numerous times.[58] Defendant contends that Plaintiffs cannot establish a recklessness scienter based on Defendant's failure to file its Certificate because an annual filing is not required, and failure to explain the tax-loss statement after it was made cannot give rise to a strong and compelling inference of scienter.

Reckless misconduct may also suffice as the requisite mental state, and recklessness is defined as "conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."[59] "[A]llegations that the defendant possessed knowledge of facts that are later determined by a court to have been material, without more, is not sufficient to demonstrate that the defendant intentionally withheld those facts from, or recklessly disregarded the importance of those facts to, a company's shareholders in order to deceive,

---

[58]As the Court has already found that Plaintiffs sufficiently alleged that Defendant intentionally made a misleading statement with regard to the tax-loss carry forward statement, it declines to address whether Defendant was reckless in making the statement.

[59]*Fleming*, 264 F.3d at 1260 (citation omitted).

manipulate, or defraud."[60] "Court have been cautious about imposing liability for securities fraud on reckless conduct, however."[61]

With regard to the filing of the Certificate, it is irrelevant whether the Certificate was required to be filed every year as an exhibit to Defendant's 10-K filing. Even if it was required, Defendant's failure to file is extraneous and not at all relevant to whether Defendant's tax-loss carry forward or future tender offer statement was misleading. In addition, "[t]he question is not merely whether the [defendant] had knowledge of the undisclosed facts; rather, it is the *danger of misleading buyers* that must be actually known or so obvious that any reasonable man would be legally bound as knowing."[62] There was no danger in misleading buyers by the failure to file the Certificate each year because the Certificate was already on file. Plaintiffs alleged that Defendant first filed the Certificate in 1993. The Court concludes that Defendant's failure to file the Certificate with its annual 10-K filing was not reckless and has no bearing on the alleged misrepresentations.

*Scienter with regard to individuals*

Defendant contends that Plaintiffs have failed to plead that any individual working for Defendant acted with scienter, and Defendant Golsen's position alone is insufficient to establish that he acted with scienter. In addition, Defendant asserts that the collective scienter of unspecified employees cannot establish scienter of Defendant. Plaintiffs assert that the allegations in the complaint indicate that Defendant Golsen wholeheartedly participated in the fraud, and his scienter is attributable to Defendant LSB. Plaintiffs also contend that the complaint sets forth the names of

---

[60]*Id.*

[61]*Id.*

[62]*Id.* (citation omitted) (emphasis in original).

Defendant LSB's employees who assisted Defendant Golsen in the fraud.

"[S]tanding alone, the fact that a defendant was a senior executive in a company cannot give rise to a strong inference of scienter. However, that [Golsen] was the most senior executive of the Company is a fact relevant in our weighing of the totality of the allegations."[63] "The scienter of the senior controlling officers of a corporation may be attributed to the corporation itself to establish liability as a primary violator of § 10(b) and Rule 10b-5 when those senior officials were acting within the scope of their apparent authority."[64]

Here, Plaintiffs have specifically alleged that Golsen lied to Plaintiffs because Golsen told Plaintiffs that converting all of their Preferred Shares would jeopardize Defendant's tax-loss carry forward. Plaintiffs allege that Golsen repeatedly told them that conversion of their Preferred Shares would cause Defendant to loss a valuable tax-loss carryover. In addition, Plaintiffs alleged that they asked several individuals who worked for Defendant for support for the tax-loss carry forward statement. Specifically, Plaintiffs provided a portion of an email from Heidi Brown, managing counsel at LSB, in which she referenced Golsen's discussion with Plaintiffs about limiting the number of Preferred Shares Plaintiffs could redeem.

With regard to the tender offer statement, Golsen was the individual who signed the contract as Chief Executive Officer which raises the inference that Golsen agreed to the content of the November agreement stating that Defendant was not contemplating a tender offer as of the date of the agreement. As the contract between Defendant and Plaintiffs was signed by Golsen, the Chief Executive Officer of Defendant LSB, this is relevant in determining whether Plaintiffs have

---

[63]*Adams*, 340 F.3d at 1106 (citation omitted).

[64]*Id.*

-29-

adequately alleged that any individual at LSB acted with scienter. The Court concludes that there are sufficient allegations supporting that individuals at LSB acted with scienter.

*Complaint as a whole*

Defendant asserts that Plaintiffs' allegations fall short when the complaint is considered in its entirety, and if the Court were to do a comparative analysis under *Tellabs*, it would only find non-fraudulent inferences. As stated above, the Court finds that there is a fraudulent inference that is cogent and at least as compelling as the non-fraudulent inference. Considering the complaint as a whole, the Court finds that Plaintiffs have stated a claim under the PSRLA.

### 4. Heightened Pleading Standards

Defendant contends that Plaintiff's complaint fails to satisfy the stringent pleading requirements of Fed. R. Civ. P. 9(b) and the PSLRA because Plaintiffs have not cited with particularity the "who, what, when, where, and how" as to each alleged misrepresentation. For substantially the same reasons as stated in Plaintiffs' brief, the Court finds that Plaintiffs have cited with particularity "the who, what, when, where, and how." Plaintiffs have identified the individuals, the specific misrepresentations, the time frame (including specific dates), and the medium in which the misrepresentations were conveyed (letter, email, and telephone calls). Accordingly, the Court finds that Plaintiffs have sufficiently stated with particularity a claim that satisfies the pleading requirements of PSLRA and Rule 9(b).

### Remaining State Law Claims

Defendant states that Plaintiffs' fraud-based state law claims should be dismissed because Plaintiffs have failed to satisfy the stringent pleading requirements of Rule 9(b). However, for substantially the same reasons as asserted above that Plaintiffs have alleged with particularity their

PSLRA claim, the Court finds that Plaintiffs have stated a claim for fraud, fraudulent inducement, a claim under § 501 of the Kansas Uniform Securities Act, and breach of fiduciary duty. As such, the Court denies Defendant's motion to dismiss these four state-law claims.

Finally, with regard to the breach of contract claim, Defendant asks the Court to determine that Plaintiffs fail to state a claim because it did not breach the contract between Defendant and Plaintiffs. The Court declines, at the motion to dismiss stage, to determine as a matter of law, whether Defendant did or did not breach the November agreement. Accordingly, the Court denies Defendant's motion to dismiss the breach of contract claim.

### Personal Jurisdiction

The Court now turns to Defendant Jack Golsen's motion which asserts that the three claims brought against him should be dismissed because he is not subject to personal jurisdiction in Kansas.[65] Golsen contends that he does not have sufficient minimum contacts with Kansas. Golsen lives in Oklahoma City, Oklahoma; has never lived in Kansas and does not regularly travel to Kansas; has never owned or lease any real property in Kansas; has not engaged in business in Kansas in his individual capacity; does not personally have an office or other facilities in Kansas and does not personally employ anyone in Kansas; did not sign the November agreement at issue in his individual capacity but only in his capacity as Chief Executive Officer; and signed the November agreement at LSB's offices in Oklahoma.

A plaintiff opposing a motion to dismiss based on lack of personal jurisdiction bears the burden of showing that personal jurisdiction over the defendant is appropriate.[66] In a pre-trial

_____

[65]These include: (1) fraudulent inducement, (2) fraud, and (3) breach of fiduciary duty.

[66]*Thermal Components Co. v. Griffith*, 98 F. Supp. 2d 1224, 1227 (D. Kan. 2000) (citing *Kuenzle v. HTM Sport-Und Freizeitgerate AG*, 102 F.3d 453, 456 (10th Cir. 1996).

motion to dismiss, such as when the matter is decided on the basis of affidavits and written materials, the plaintiff is only required to make a prima facie showing that personal jurisdiction is proper to avoid dismissal.[67]  Once the plaintiff makes a prima facie showing, the defendant must "present a compelling case demonstrating 'that the presence of some other considerations would render jurisdiction unreasonable.'"[68]

"The allegations in the complaint must be taken as true to the extent they are uncontroverted by the defendant's affidavits.  If the parties present conflicting affidavits, all factual disputes must be resolved in the plaintiff's favor, and 'the plaintiff's prima facie showing is sufficient notwithstanding the contrary presentation by the moving party.'"[69]  "The plaintiff has the duty to support jurisdictional allegations in a complaint by competent proof of the supporting facts if the jurisdictional allegations are challenged by an appropriate pleading."[70]

In a diversity action, "personal jurisdiction over a nonresident defendant is determined by the law of the forum state."[71]  "The proper inquiry is . . . whether the exercise of jurisdiction is sanctioned by the long-arm statute of the forum state and comports with due process requirements of the Constitution."[72]  Because the Kansas long-arm statute is construed liberally, courts may

---

[67]*Id.* "Eventually, of course, a plaintiff must establish jurisdiction by a preponderance of the evidence, either at a pretrial evidentiary hearing or at trial."  *Reed v. Phillip Roy Fin. Services, Inc.*, 2006 WL 1307611, at *1, n. 1 (D. Kan. May 9, 2006) (citations omitted).

[68]*Thermal Components*, 98 F. Supp. 2d at 1227 (citing *OMI Holdings, Inc. v. Royal Ins. Co. of Canada*, 149 F.3d 1086, 1091 (10th Cir. 1998) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 477 (1985))).

[69]*Wenz v. Memery Crystal*, 55 F.3d 1503, 1505 (10th Cir. 1995) (citations omitted).

[70]*Pytlik v. Prof'l Res., Ltd.*, 887 F.2d 1371, 1376 (10th Cir. 1989).

[71]*Caldwell-Baker Co. v. S. Illinois Railcar Co.*, 225 F. Supp. 2d 1243, 1259 (D. Kan. 2002).

[72]*Federated Rural Elec. Ins. Corp. v. Kootenai Elec. Coop.*, 17 F.3d 1302, 1304-05 (10th Cir. 1994).

proceed directly to the due process issue.[73]

The Due Process Clause allows the exercise of personal jurisdiction over a non-resident defendant "only so long as there exist 'minimum contacts' between the defendant and the forum state."[74] "The 'minimum contacts' standard may be met in one of two ways."[75] First, a court may exercise specific jurisdiction over a non-resident defendant "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate' to those activities."[76] "Where a court's exercise of jurisdiction does not directly arise from a defendant's forum-related activities, the court may nonetheless maintain general personal jurisdiction over the defendant based on the defendant's general business contacts with the forum state."[77] General jurisdiction requires plaintiff to demonstrate that defendant's contacts with the forum state are "continuous and systematic."[78]

Plaintiffs argue that Defendant Golsen is subject to specific personal jurisdiction. This involves a two step inquiry: (1) whether "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there;'"[79] and (2) "whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and

---

[73]*Id*. at 1305. In this case, the parties did not discuss Kansas' long-arm statute, K.S.A.§ 60-308(b).

[74]*OMI Holdings*, 149 F.3d at 1090 (citation omitted).

[75]*Id.*

[76]*Id.* at 1091 (quoting *Burger King*, 471 U.S. at 472).

[77]*Id*. at 1091 (citation omitted).

[78]*Id.*

[79]*Benton v. Cameco Corp.*, 375 F. 3d 1070, 1075 (10th Cir. 2004) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

substantial justice.'"[80]

*1. Minimum Contacts*

The minimum contacts inquiry requires the Court to determine "whether the defendant purposefully directed its activities at residents of the forum, and whether the plaintiff's claim arises out of or results from actions by the defendant himself that create a substantial connection with the forum state."[81] Defendant Golsen argues that he is not subject to specific personal jurisdiction for four reasons: (1) some of the alleged contacts in the complaint occurred after the November agreement was signed and Plaintiffs do not specify as to when some of the other contacts occurred; (2) the alleged telephone calls and written correspondence are insufficient to establish specific jurisdiction; (3) Golsen controverts the allegations in the complaint because he states that contrary to the allegations, he does not recall participating in any phone conversations with Kent McCarthy in October or November; and (4) the fiduciary shield doctrine protects Golsen because he was only acting on behalf of LSB in signing the November agreement.

First, while Defendant Golsen argues that some of the alleged contacts occurred after the November agreement was signed, some of the contacts occurred prior to the November agreement. Plaintiffs' allegations include that Defendant Golsen had direct communications with representatives of the Jayhawk Group regarding the November agreement, and those communications were directed and sent to Kansas. In addition, Plaintiffs allege that Golsen and McCarthy had repeated conversations about the tax-loss carry forward statement during October and November of 2006 with McCarthy participating from his office in Kansas. Accordingly, it appear that Plaintiffs have alleged

---

[80]*Id.* at 1075-76 (citing *OMI Holdings*, 149 F.3d at 1091)).

[81]*OMI Holdings*, 149 F.3d at 1091 (quotations and citations omitted).

-34-

contacts with the forum state prior to the November agreement.

Defendant contends that the alleged telephone calls and written correspondence between Golsen and Plaintiffs are insufficient to establish specific jurisdiction. In addition, Defendant Golsen contends that he has not purposefully availed himself of the privilege of conducting business in Kansas because Plaintiffs initiated the communications.

"It is well established that phone calls and letters are not necessarily sufficient in themselves to establish minimum contacts."[82] However, "[i]n proper circumstances, even a single letter or telephone call to the forum state may meet due process standards."[83] "[T]he exercise of jurisdiction depends on the *nature* of those contacts."[84] "Purposeful availment analysis turns upon whether the defendant's contacts are attributable to his own actions or solely to the actions of the plaintiff . . . . [and generally] requires . . . affirmative conduct by the defendant which allows or promotes the transaction of business within the forum state."[85] "This 'purposeful availment' requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' fortuitous,' or 'attenuated' contacts."[86]

Admittedly, the contacts are not numerous, but one contact may meet due process standards. Here, Plaintiffs have alleged that Defendant Golsen had numerous conversations with Plaintiffs occurring over several months. While the Court finds that it appears that Plaintiffs initiated most of the discussions with Defendant Golsen, Defendant Golsen engaged in conversations with Plaintiff

---

[82]*Far West Capital, Inc. v. Towne*, 46 F.3d 1071, 1077 (10th Cir. 1995).

[83]*Rambo v. Am. S. Ins., Co.,* 839 F.2d 1415, 1418 (10th Cir. 1988).

[84]*Id.* (emphasis in original).

[85]*Id.* at 1420 (citation omitted).

[86]*Burger King*, 471 U.S. at 475 (citations omitted).

McCarthy, while McCarthy was in Kansas, regarding redemption of Plaintiffs' stock. From these conversations, Plaintiffs entered into an agreement with Defendant LSB. Plaintiffs allege that they entered into this agreement due to Defendant Golsen's statements during October and November, and these conversations are the basis for Plaintiffs' claims of fraud and fraudulent inducement against Defendant Golsen.

Defendant Golsen asserts that contrary to the allegations in Paragraph 57 of the complaint stating that numerous telephone conversations took place between Golsen and McCarthy in October and November about the tax-loss carry forward, Golsen does not recall participating in any phone conversations with McCarthy. Plaintiffs argue that Defendant does not specifically deny that the conversations occurred but only denies that he recalls participating in them. While Defendant asserts that Plaintiffs make no attempt to present any evidence to contradict Golsen's declaration that he did not participate in the conversations, Plaintiffs correctly point out that Golsen did not deny in his affidavit that the conversations occurred. Because the Court must view the facts in the light most favorable to Plaintiff and Defendant did not specifically deny in his affidavit that the phone conversations occurred in October or November, the Court must take as true that the conversations as stated in Plaintiffs' complaint occurred.[87]

Finally, Defendant asserts that the Court lacks personal jurisdiction over him because he is protected by the fiduciary shield doctrine. "The Tenth Circuit has accepted the use of the fiduciary shield doctrine for individual corporate officers defending a tort claim where they have no personal

---

[87]The Court notes that this is primarily a semantics disagreement, but the Court must view the complaint in the light most favorable to Plaintiffs, and Defendant did not adequately controvert Plaintiffs' allegation in his affidavit because he did not state that the conversations did not occur. Had Defendant made this statement, Plaintiffs would have been obliged to submit a competing affidavit. In any event, "if the affidavits are conflicting, the factual disputes are resolved in plaintiff's favor and the prima facie case will have been established." *Traffas v. Bridge Capital Corp.*, 1990 WL 251740, at *3 (D. Kan. Dec. 3, 1990).

contacts, independent of their representative contacts, with the forum and where there is no factual basis to pierce the corporate veil."[88] "An individual's actions, solely in the capacity as a corporate officer, [do] not create personal jurisdiction over that individual. . .."[89] "However there are circumstances under which nonresident individuals can be subjected to long-arm jurisdiction because of the individual's role with respect to a corporation, including use of the corporate entity in promoting injustice or fraud."[90]

Here, Plaintiffs allege that Defendant Golsen fraudulently induced them to enter into a contract with Defendant LSB by telling them that they could not redeem all of their Preferred Shares due to tax-loss carry forward concerns. While Defendant argues that Plaintiffs fail to acknowledge that Golsen was acting on behalf of LSB in signing the November agreement, Plaintiffs' claims are that Golsen perpetrated a fraud and fraudulently induced Plaintiffs to enter into that agreement with LSB. Plaintiffs allege that Golsen specifically informed Plaintiffs that LSB's tax-loss carry forward would be jeopardized if Plaintiffs redeemed all of their Preferred Shares. It on this basis that Plaintiffs allege they entered into the contract with LSB.[91] Plaintiffs also allege that Golsen is the largest individual shareholder in LSB and thus has a personal motive. It does not appear that Plaintiffs are merely relying on the November contract as the basis for asserting personal jurisdiction over Golsen or that they are seeking to assert personal jurisdiction over him merely by virtue of jurisdiction over LSB. Plaintiffs specifically allege that Golsen personally participated in the

[88]*Caldwell-Baker,* 225 F. Supp. 2d at 1262 (citation omitted).

[89]*Id.* (citing *Knuth v. Lutheran Church Mo. Synod.*, 643 F. Supp. 444, 446 (D. Kan. 1986)).

[90]*Dazey Corp. v. Wolfman*, 948 F. Supp. 969, 975 (D. Kan, 1996) (quotations and citations omitted).

[91]It is true that the November agreement signed by Defendant Golsen was in his capacity as CEO of LSB. The Court notes that Plaintiffs' breach of contract claim is only brought against LSB.

misrepresentations as he is the individual alleged to have told Plaintiffs of the tax-loss carry forward. "[W]hen the defendant is the 'primary participant [ ] in an alleged wrongdoing intentionally directed at a . . . [forum] resident, . . . jurisdiction over . . . [him] is proper on that basis.'"[92] Accordingly, the Court finds the fiduciary shield doctrine inapplicable to the facts of this case.[93]

At this stage, Plaintiffs bear a light burden in establishing a prima facie showing of personal jurisdiction. While Defendant Golsen's contacts with Kansas are not numerous, Plaintiffs have alleged enough to demonstrate minimum contacts. In sum, the Court finds that Plaintiffs have shown that Defendant Golsen had sufficient minimum contacts with the forum state.

### 2. Fair Play and Substantial Justice

Because Plaintiff has made a prima facie showing of minimum contacts, Defendant must establish a "compelling case" that jurisdiction would be unreasonable.[94] The determination of fair play and substantial justice "requires a case-specific inquiry into the reasonableness of the exercise of personal jurisdiction over a defendant who has minimum contacts with the forum state."[95] To assess reasonableness, there are five factors:

> (1) the burden on the defendant, (2) the forum state's interest in resolving the dispute, (3) the plaintiff's interest in receiving convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the several states in furthering

---

[92]*Dodson Int'l Parts, Inc. v. Altendorf*, 181 F. Supp. 2d 1248, 1255 (D. Kan. 2001) (citing *Calder v. Jones*, 465 U.S. 783, 790 (1984)).

[93]Although the Court did not decide the issue, the District of Kansas recently questioned the continued validity of the fiduciary shield doctrine. *See First Magnus Fin. Corp. v. Star Equity Funding, L.L.C.*, 2007 WL 635312, at *6, n. 3. The Court noted "[t]his doctrine is exclusively a creation of state law, and numerous federal courts have declined to consider its applicability when the state's long-arm statute is coterminous with the full reach of due process." *Id*. (citing *Int'l Adm'rs, Inc. v. Pettigrew*, 430 F. Supp. 2d 890, 898 (S.D. Iowa 2006)).

[94]*See AST Sports Science, Inc. v. CLF Distrib., Ltd*., 514 F.3d 1054, 1063 (10th Cir. 2008); *see also Thermal Components*, 98 F. Supp. 2d at 1227.

[95]*TH Agric. & Nutrition, LLC v. Ace European Group Ltd*., 488 F.3d 1282, 1292 (10th Cir. 2007).

fundamental substantive social policies.[96]

"[T]he reasonableness prong of the due process inquiry evokes a sliding scale; the weaker the plaintiff's showing on [minimum contacts], the less a defendant need show in terms of unreasonableness to defeat jurisdiction. The reverse is equally true: an especially strong showing of reasonableness may serve to fortify a borderline showing of [minimum contacts]."[97]

Because Plaintiffs' showing on minimum contacts is weaker, Defendant Golsen needs to show less in terms of unreasonableness. Defendant Golsen, however, does not address any of these factors as he asserts that the Court does not need to reach the question of fair play because Plaintiffs fail to establish that Golsen had minimum contacts with Kansas. Plaintiffs argue that exercising personal jurisdiction over Golsen does not offend traditional notions of fair play and substantial justice because Plaintiffs are the alleged victims of tortious activity resulting from multiple contacts with Defendant Golsen in the state of Kansas. In addition, Plaintiffs assert that because they are a Kansas company, Kansas is interested in the dispute. Finally, Plaintiffs assert that Golsen will not be unduly burdened because he is the CEO of LSB which engages in business beyond its state borders.

As stated above, although Defendant Golsen needs to show less on the reasonableness scale due to Plaintiffs' weaker showing of minimum contacts, he does not address any reasonableness factor. As such, Defendant Golsen has not demonstrated a "compelling case" that this Court's jurisdiction would be unreasonable. Because the Court has determined that Defendant Golsen is subject to personal jurisdiction and has determined that the federal and state law claims should not

---

[96]*Id.*

[97]*Benton*, 375 F.3d at 1079 (citations omitted).

-39-

be dismissed against Defendant LSB, the Court denies Defendant Golsen's motion to dismiss.

**IT IS ACCORDINGLY ORDERED** this 10th day of November, 2009 that Defendant Golsen's Motion to Dismiss (Doc. 27) is hereby denied.

**IT IS FURTHER ORDERED** that Defendant LSB's Motion to Dismiss (Doc. 29) is hereby denied.

**IT IS SO ORDERED**.

/s Eric F. Melgren
ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE