# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

JAYHAWK CAPITAL MANAGEMENT,
LLC, et al.,

*Plaintiffs*,

vs.

Case No. 08-2561-EFM

LSB INDUSTRIES, INC., et al.,

*Defendants.*

## MEMORANDUM AND ORDER

Plaintiffs, longtime major shareholders of Defendant LSB Industries, Inc., entered into a contract with Defendant LSB Industries, Inc. in November of 2006. This November agreement limited the number of Preferred Shares Plaintiffs could exchange for common shares if a tender offer occurred within one year of signing the agreement. In early 2007, Defendant initiated a tender offer. Pursuant to the November agreement, Plaintiffs could only tender 52% of their Preferred Shares. In July 2007, Defendant announced the redemption of the remaining Preferred Shares. Plaintiffs decided to convert their remaining Preferred Shares to common shares at a lower conversion rate than the exchange rate in February.

Plaintiffs filed this lawsuit on November 7, 2008. They bring six claims, including fraudulent inducement; fraud; violation of § 10(b) of the Securities and Exchange Act of 1934 & Regulation 10b-5; violation of the Kansas Uniform Securities Act, K.S.A. § 17-12A501; breach of

fiduciary duty; and breach of contract.

There are five motions before the Court. Plaintiffs filed a motion for summary judgment on Defendants' third affirmative defense (Doc. 132), and Defendants filed a cross motion for summary judgment on its third affirmative defense (Doc. 141). Defendant LSB filed a motion for summary judgment on the breach of contract claim (Doc. 137). Defendant Golsen filed a motion for summary judgment asserting that the Court lacks personal jurisdiction over him (Doc. 139). Finally, Defendants filed a Motion to Exclude Testimony of Kent McCarthy (Doc. 147).

As described below, the Court denies Plaintiffs' and Defendants' motions for summary judgment on Defendants' third affirmative defense; denies Defendant LSB's motion for summary judgment; grants Defendant Golsen's motion for summary judgment; and denies Defendants' motion to exclude testimony of Kent McCarthy.

### I. Motions for Summary Judgment (Docs. 132, 137, 139, and 141)[1]

*A.    Legal Standard*

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[2] "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either way."[3] A fact is "material" when "it is essential to the proper disposition of the claim."[4] The court must view the evidence and all reasonable inferences in the light most favorable to the nonmoving party.[5]

---

[1] The Court will set forth the pertinent uncontroverted facts in each section.

[2] Fed. R. Civ. P. 56(a).

[3] *Haynes v. Level 3 Communications*, LLC, 456 F.3d 1215, 1219 (10th Cir. 2006).

[4] *Id.*

[5] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[6] In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[7]

If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[8] The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[9] "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[10] Conclusory allegations alone cannot defeat a properly supported motion for summary judgment.[11] The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[12]

### B.  *Cross Motions for Summary Judgment (Docs. 132, 141)*

Even though the parties have filed cross-motions for summary judgment, the legal standard

---

[6]*Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[7]*Id.* (citing *Celotex*, 477 U.S. at 325.)

[8]*Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[9]*Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[10]*Adler*, 144 F.3d at 671.

[11]*White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

[12]*Bones v. Honeywell Intern, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

does not change.[13] The Court must determine if there are any disputed material facts.[14] Each motion will be treated separately.[15] "To the extent the cross-motions overlap, however, the court may address the legal arguments together."[16]

In Defendants' Answer to Plaintiffs' Amended Complaint, they assert the affirmative defense that "Plaintiffs claims are barred in whole, or in part, by the principles of accord and satisfaction, release, and/or settlement."[17] Defendants contend that Plaintiffs agreed to settle this case in May 2008 for $100,000. As such, Defendants move for summary judgment and seek dismissal of Plaintiffs' lawsuit on the basis that the parties entered into an enforceable settlement agreement. Plaintiffs move for summary judgment on Defendants' third affirmative defense seeking dismissal of the defense and the Court's ruling that there is no enforceable settlement agreement.

In 2008, it appears that the parties had discussions regarding settlement of claims that Plaintiffs may potentially bring against Defendant.[18] On May 28, 2008, Jim McMullen,[19] then in-house counsel and COO for Jayhawk, called Bruce Collins, outside counsel for LSB, to discuss issues relating to LSB's failure to convert Preferred Shares owned by Jayhawk and the University of Kansas Endowment Fund on the same terms as other preferred shareholders. Jayhawk had not

---

[13]*City of Shawnee v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1172 (D. Kan. 2008).

[14]*Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[15]*Id.*

[16]*Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010) (citing *Hjersted Family Ltd. P'ship v. Hallauer*, 2009 WL 902428, at *2 (D. Kan. Mar. 31, 2009)).

[17]In the parties' Pretrial Order, release/settlement is listed as an affirmative defense in Paragraph 7(a)(4). Estoppel is listed in Paragraph 7(a)(3).

[18]Many of the facts, or rather the interpretation of the facts, are disputed by the parties.

[19]McMullen reported directly to Kent McCarthy, CEO of Jayhawk. The parties dispute whether McMullen had authority to enter into a settlement agreement on behalf of Plaintiffs.

yet filed suit.[20]

The parties have different interpretations of the May 28, 2008 phone call between McMullen and Collins. McMullen contends that he did not make an offer of settlement, but he did testify that he "probably threw that idea out." Collins asserts that McMullen made an offer, and he accepted on behalf of LSB during the phone conversation.

On June 4, 2008, Collins emailed McMullen with the subject line "settlement." Collins copied David Shear, Senior Vice President and General Counsel for LSB Industries, on the email. In this email, Collins provided his "understanding of the settlement" and included three points.[21] Collins concluded the email by asking McMullen to let him "know promptly if you believe that my understanding is incorrect in any way. Also, please advice me as soon as possible when KU has agreed to these terms."

On June 5, McMullen responded and stated that he would get back with Collins on Monday as he "need [ed] to circle back with the McCarthys to make they understand the charitable giving piece of the proposal."

On June 10, 2008, Shear sent an email to McMullen stating, in part, that "[t]he proposal was yours, and we need to know right away whether you are going to follow through because of our looming answer date in the KU case." McMullen responded that day that he was sorry for the delay and was only able to speak with the McCarthys the previous night and would call Collins that

---

[20] The KU Endowment Charitable Gift Fund had filed suit against LSB Industries, Inc. on February 8, 2008, Case No. 08-2066-KHV-JPO. McMullen was not counsel for the KU Endowment Charitable Gift Fund, but he apparently sat through a settlement meeting that occurred in March 2008 between the KU Endowment Fund and LSB. The case settled and was voluntarily dismissed on August 18, 2008.

[21] The three points included: (1) settlement of claims or potential claims against LSB by Kent McCarthy and all of the funds he manages; (2) payment from LSB and McCarthy to the University of Kansas in settlement of KU's claims against LSB; and (3) settlement documents being executed on June 11.

afternoon.

On June 13, 2008, McMullen emailed Collins stating that he had "discussed at length with my client. [McCarthy] would be willing to move forward with the KU piece of the settlement only at this point. . . . ." Three days later, Collins responded by stating that McMullen's email was a "little confusing" and that "LSB has accepted your offer of payment of $100,000 to McCarthy/Jayhawk. This is what you demanded in settlement, and this is what LSB agreed to in the interest of making peace. . . . ."

That same day, McMullen responded to Collins asking for a follow up call and stating that "[w]e certainly don't believe the matters are settled . . . ." Several other emails were exchanged over the next ten days between McMullen and Shear with Shear asserting that they believed the matter was settled and McMullen asserting that they did not believe the matter was settled. Plaintiffs filed suit approximately five months later, and Defendants asserted the affirmative defense of settlement. Both parties seek summary judgment.

As an initial matter, the parties disagree as to which state's law applies. Defendants argue that under the principle of *lex loci contractus*, Texas law should apply because the settlement agreement between the parties was accepted by Defendants' counsel in Texas. Plaintiffs assert that there is a question of whether there was any offer of settlement, so therefore Kansas law should apply. Plaintiffs, however, provide no law or support for their position.

A federal court sitting in diversity applies the choice of law rules of the state in which it sits.[22] "For purposes of contract construction, Kansas follows the theory of *lex loci contractus* - the

---

[22] *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941).

-6-

place of the making of the contract controls."[23] "[T]he court looks to where the last act necessary for the creation of the contract takes place, and that state's law controls."[24] "Matters bearing upon the execution, the interpretation and the validity of a contract are determined by the law of the place where the contract is made."[25]

In this case, the parties dispute whether there is an enforceable contract. The material issue is whether the parties agreed to a contract, and the last act necessary would be in Texas where Defendants allegedly accepted the settlement offer. Because this involves an issue as to the formation or enforceability of the contract, it appears that Texas law would apply.[26]

"The existence of an oral contract may be proved by circumstantial as well as direct evidence."[27] The court considers the "communications between the parties" and "the acts and circumstances surrounding those communications."[28] "To form an enforceable contract, there must be an offer, an acceptance, and a meeting of the minds, and the terms must be expressed with sufficient certainty so that there will be no doubt as to what the parties intended."[29] "To determine

---

[23]*Clements v. Emery Worldwide Airlines, Inc.*, 44 F. Supp. 2d 1141, 1145 (D. Kan. 1999) (citation omitted).

[24]*Id.*

[25]*King v. Citizens Bank of Warrensburg*, 1990 WL 154210, at *3 (D. Kan. Sept. 19, 1990) (citing *Sykes v. Bank*, 78 Kan. 688, 98 P. 206 (1908)); *see also Fireworks Spectacular, Inc. v. Premier Pyrotechnics, Inc.*, 147 F. Supp. 2d 1057, 1064 and 1064 n. 3 (D. Kan. 2001) (applying *lex loci contractus* when determining whether the parties entered into a valid non-compete agreement).

[26]Both parties, however, cite to Kansas and Texas law, and there does not appear to be material differences between the laws of both states.

[27]*Harris v. Balderas*, 27 S.W.3d 71, 77 (Tex.App.-San Antonio 2000).

[28]*Id.*

[29]*Id.; see also Disney v. Gollan,* 233 S.W.3d 591 (Tex.App.-Dallas 2007) (discussing essential terms in a settlement agreement as the amount to be paid and the liability to be released; *see also Lerer v. Lerer*, 2002 WL 31656109, at *3 (Tex.App.-Dallas, 2002 ) (unpublished) (stating that an essential term also includes the intent of the parties to be bound).

whether there was an offer and acceptance, and therefore a 'meeting of the minds,' courts use an objective standard, considering what the parties did and said, not their subjective states of mind."[30]

The parties disagree as to whether McMullen made an offer during the phone conversation, whether there was a meeting of the minds (including whether the parties agreed to the essential terms of the contract), and whether McMullen had the authority to enter into a settlement agreement on behalf of Plaintiffs. Defendants contend that Plaintiffs, through McMullen, made an offer as to the essential terms of the settlement during the May 28th phone call, and Defendants accepted through Collins. Plaintiffs argue that not only did McMullen not make an offer during the phone conversation, but there was no meeting of the minds between the parties, and the parties contemplated that any agreement would be reduced to writing. Plaintiffs also assert that McMullen did not have the authority to enter into a settlement agreement and Defendants were aware of this fact. Defendants disagree.

The Court recognizes that an objective standard is employed in determining whether a meeting of the minds occurred. In addition, the Court recognizes that a bench trial is scheduled, and the Court will ultimately make the determination as to whether the parties entered into a settlement agreement. Although it appears unlikely from the circumstances that the parties entered into a settlement agreement because there was no meeting of the minds; the Court cannot, at this point, conclude as a matter of law that the parties did not have an agreement because there are factual determinations to be made.[31] As such, Plaintiffs' motion for summary judgment is denied.

---

[30]*Domingo v. Mitchell*, 257 S.W.3d 34, 39 (Tex.App.-Amarillo 2008); *see also Komet v. Graves*, 40 S.W. 3d 596, 601 (Tex.App.-San Antonio 2001).

[31]There appear to be factual and credibility considerations surrounding the May 28th phone call between McMullen and Collins.

In addition, because the Court concludes that factual questions remain as to whether the parties reached an agreement, Defendants' motion for summary judgment on its third affirmative defense is also denied.[32]

### C.   *Defendant LSB's Motion for Summary Judgment (Doc. 137)*

Plaintiffs bring a breach of contract claim alleging that Defendant LSB failed to pay them unpaid and cumulative dividends when Plaintiffs converted their stock in August 2007. Defendant moves for summary judgment asserting that the language in the Certificate of Designations, the contract that governed the parties, is unambiguous and does not require Defendant to pay dividends to Plaintiffs because Plaintiffs opted to convert their shares rather than redeem their shares.

A few facts are uncontroverted. Plaintiffs' Preferred Shares are governed by the Certificate of Designations of the $3.25 Convertible Exchangeable Class C Preferred Stock, Series 2 of LSB Industries, Inc. Plaintiffs entered into an agreement in November 2006 limiting their ability to convert all of their Preferred Shares if a tender offer occurred.[33] In early 2007, Defendant conducted a tender offer, and Plaintiffs converted approximately 52% percent of their Preferred Shares, the limit set by the November 2006 agreement. In July 2007, Defendant announced the redemption of the remaining Preferred Shares. The conversion rate was approximately half the rate in February. Plaintiffs converted their remaining Preferred Shares.

---

[32]Defendants also raise an estoppel argument asserting that Plaintiffs should be estopped from denying the settlement of its claims because McMullen allegedly conceded at his deposition that he "massaged" the negotiation regarding Jayhawk's claims in such a way to get LSB to agree to a settlement of KU's claims. There are several issues with Defendants' estoppel argument. First, as noted above, there appear to be factual questions surrounding the negotiations. In addition, the Court cannot conclude from the evidence in front of it whether or not the settlement between Defendant and KU (a separate case) is relevant to the determination of this matter.

[33]The parties dispute whether the agreement was fraudulently induced.

Plaintiffs and Defendant hold widely different views on the language in the Certificate of Designations. Plaintiffs argue that they are entitled to the unpaid and cumulative dividends, whether or not they were declared. As such, Plaintiffs contend that when they converted their shares, they were due approximately $4 million dollars. Defendant argues that Plaintiffs would only be entitled to dividends if the Board declared and set a record date for a dividend and Plaintiffs converted their shares on a redemption date between the dividend record date and the due date of that dividend. Accordingly, Defendant contends that because Plaintiffs converted their shares at a time that Defendant had not declared a dividend that had a record date prior to and due date after the redemption, Plaintiffs are not entitled to the unpaid cumulative dividends.

Both parties focus their arguments on the provisions of the Certificate and the Redemption Notice that are favorable to them without squarely addressing the language unfavorable to them. The Court will not set forth the language at issue in the Certificate of Designations. Suffice to say, it is long and convoluted, and different parts of the Certificate appear favorable to both parties. Because there are disputed facts, the disposition of this claim on summary judgment is inappropriate, and the Court will hear the parties' arguments at trial. Accordingly, the Court denies Defendant LSB's motion for summary judgment on Plaintiffs' breach of contract claim.

### D. *Defendant Golsen's Motion for Summary Judgment (Doc. 139)*

The Court turns to Defendant Jack Golsen's motion for summary judgment which asserts that the three claims brought against him should be dismissed because he is not subject to personal jurisdiction in Kansas.[34] Previously, Defendant Golsen brought a motion to dismiss, and the Court denied the motion. However, the Court made this determination on the allegations in the Amended

---

[34] These include: (1) fraudulent inducement, (2) fraud, and (3) breach of fiduciary duty. These claims are also asserted against Defendant LSB.

Complaint and Defendant Golsen's affidavit.

Defendant Golsen now contends that after more than a year of discovery, there is no evidence connecting him personally with Plaintiffs' claims against him. Those facts include the following. Golsen, Chairman and CEO of LSB Industries, lives in Oklahoma City, Oklahoma. He does not live in Kansas, nor regularly travel to Kansas. He has never owned or leased any real property in Kansas; does not have a personal mailing address, bank or other financial account, or telephone listing in Kansas; and has never personally paid Kansas income taxes.

Golsen does not personally have an office or other facilities in Kansas and does not personally employ anyone in Kansas. Golsen did not travel to Kansas for any purpose related to the negotiation, execution, and performance of the November 2006 Agreement between Defendant LSB and Plaintiffs. Of the conversations between Kent McCarthy, CEO of Jayhawk, and Golsen regarding conversion of Plaintiffs' Preferred Stock occurring between June 2006 and September 2006, McCarthy could only specifically recall his location for one telephone call: Palm Springs, California.

Golsen avers that with regard to the telephone conversations that he had with McCarthy during 2006 and 2007 regarding the negotiation, execution, and performance of the November 2006 Agreement, Golsen understood that McCarthy was in Nevada for those conversations.[35] The one in-person meeting between Golsen and McCarthy regarding the negotiation, execution, and performance of the November 2006 Agreement occurred in Tulsa, Oklahoma.

---

[35]Plaintiffs contend that Golsen's affidavit and this averment directly conflicts with Golsen's previous affidavit in which he averred that "[t]o the best of my recollection, I did not engage in any telephone conversations with Kent McCarthy or any other representatives of Plaintiffs in Kansas related to LSB's tender offer . . . ." Defendants point out that it is not conflicting because Golsen previously averred he did not recall any conversations *in Kansas*. The Court agrees and concludes that Golsen's testimony is not conflicting.

During 2004 and 2009, McCarthy lived and conducted most of his work in Incline Village, Nevada. During this same time frame, McCarthy infrequently traveled to Kansas, and he traveled to Kansas on an as-needed basis. McCarthy did not attend regular meetings in Kansas.

Whether Defendant Golsen is subject to specific personal jurisdiction involves a two step inquiry.[36] This includes: (1) whether "defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there;'"[37] and (2) "whether the exercise of personal jurisdiction over the defendant offends 'traditional notions of fair play and substantial justice.'"[38]

The first inquiry requires the Court to determine "whether the defendant purposefully directed its activities at residents of the forum, and whether the plaintiff's claim arises out of or results from actions by the defendant himself that create a substantial connection with the forum state."[39] As noted in the Court's previous order, the Court construed the allegations in the complaint in the light most favorable to Plaintiff and concluded that the allegations included several conversations between Golsen and McCarthy, with McCarthy participating from his office in Kansas. Although the conversations and communications were not numerous, the Court found that the allegations indicated Golsen's conversations and communications directed toward individuals in Kansas may have induced Plaintiffs to enter into the November 2006 Agreement. As such, the Court concluded Plaintiffs had met their burden in demonstrating personal jurisdiction over

---

[36]In this Court's previous Order (Doc. 44), the applicable law relating to personal jurisdiction was set forth in more detail and therefore will not be set forth again in this Order.

[37]*Benton v. Cameco Corp.*, 375 F. 3d 1070, 1075 (10th Cir. 2004) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

[38]*Id*. at 1075-76 (citing *OMI Holdings*, 149 F.3d at 1091)).

[39]*OMI Holdings*, 149 F.3d at 1091 (quotations and citations omitted).

Defendant Golsen.

After discovery, however, there is no evidence to support those allegations. Indeed, the evidence demonstrates that McCarthy could not recall any specific conversation occurring in Kansas, and the only specific conversation McCarthy recalled took place in California. In addition, McCarthy lived in Nevada during the applicable timeframe. McCarthy conducted most of his business in Nevada, and he infrequently traveled to Kansas. Golsen averred that he understood McCarthy to be in Nevada during the telephone conversations they had during 2006 regarding the November 2006 Agreement. The only in-person meeting occurred in Oklahoma.

Plaintiffs' argument that McCarthy's deposition testimony confirms McCarthy's presence in Kansas in June 2006, during which there were numerous calls exchanged between Golsen and McCarthy regarding the exchanged of shares, is not supported by the record. McCarthy testified that he would not be surprised if he did not talk to Golsen two or three times a month between June and September 2006 regarding the conversion rate. He also testified that ninety percent of the phone calls were on his cell phone that McCarthy initiated. McCarthy then testified that he was mostly in Incline, [Nevada], but he was "sure" that he was in Kansas in June. When questioned whether McCarthy could specifically recall being in Kansas and having a conversation with Golsen, he could not. As such, it is pure speculation that McCarthy had any conversation with Golsen while McCarthy was in Kansas relating to the November 2006 Agreement. Accordingly, Plaintiff has not provided any evidence of conversations occurring between McCarthy and Golsen in Kansas.

Plaintiffs also argue that a letter written by Meredith Lang, then in-house counsel of Jayhawk, demonstrates Golsen's contacts with Kansas. In certain circumstances, a single letter or

phone call to the forum state may be sufficient to establish minimum contacts.[40] However, "the exercise of jurisdiction depends on the *nature* of those contacts."[41]

In this case, Lang wrote a letter to Golsen expressing her thanks to him for returning her phone call. Lang stated that she wanted to follow up on their phone conversation by reiterating that McCarthy wanted to convert all of his preferred shares. In addition, she stated that she appreciated his "concerns related to any change in ownership." Plaintiffs contend that the letter demonstrates that Golsen initiated a call to Defendants, and it is clear that Golsen reiterated his fraudulent statements. The Court cannot so conclude.

At most, there is evidence that Golsen returned a phone call to Plaintiffs' employee. This does not indicate that Golsen purposefully directed his activities to the forum state. In addition, there is no evidence that Golsen reiterated his allegedly fraudulent statements in the phone call. Lang testified in her deposition that she could not recall the substance of that conversation. Plaintiffs' evidence is simply insufficient to demonstrate that Defendant Golsen's contacts establish a substantial connection with Kansas for the Court to assert personal jurisdiction over Defendant Golsen.[42] As such, the Court grants Defendant Golsen's motion for summary judgment.

### E.    *Defendants' Motion to Exclude Testimony of Kent McCarthy (Doc. 147)*

Defendants seek to prevent Kent McCarthy from testifying as to Plaintiffs' damages because

---

[40]*Rambo v. Am. S. Ins., Co.,* 839 F.2d 1415, 1418 (10th Cir. 1988). The Court noted this in its previous Order. Doc. 44.

[41]*Id.* (emphasis in original).

[42]Because the Court finds that Plaintiffs do not establish a prima facie case of minimum contacts, the Court will not address fair play and substantial justice considerations. *See AST Sports Science, Inc. v. CLF Distrib., Ltd*., 514 F.3d 1054, 1061 (10th Cir. 2008) (determining that once the Court finds sufficient minimum contacts, the Court continues on to determine whether the exercise of jurisdiction is reasonable employing a five-factor test). In the Court's previous order, the Court addressed fair play considerations because Plaintiffs had made a prima facie showing of minimum contacts. In contrast, Plaintiffs now cannot demonstrate minimum contacts on behalf of Golsen.

he was not previously listed as an expert witness, and he was not disclosed as a lay witness having discoverable information as to damages. Plaintiffs' Rule 26(a)(1) Initial Disclosures disclosed Kent McCarthy as a person likely to have discoverable information on the claims in the case. In these initial disclosures, Plaintiffs did not specifically list "damages" as a subject on which McCarthy would testify.

Plaintiffs asserted that they were seeking damages on:

unpaid dividends, which amounts are expected to be the subject of expert testimony - the value of this claim is presently estimated at approximately $4,000,000

diminution in the value of Jayhawk's ownership interest in LSB, which amount is expected to be the subject of expert testimony - the value of this claim is presently estimated at approximately $12,000,000

In Plaintiffs' expert disclosures, Plaintiffs listed two individuals from Plaintiff Jayhawk as non-retained expert witnesses.[43] McCarthy was not listed. Plaintiffs identified a retained expert, Dr. Scott Hakala. Dr. Hakala's expert report provides, in part, that Plaintiffs' damages were either $6,236,000 or $7,934,000.[44] Dr. Hakala was also deposed. Defendants' expert, Dr. Mohan Rao, opines that Dr. Hakala's measure of damages are flawed.

---

[43]These include Jim McMullen and Mike Schmitz. Neither are designated as non-retained experts anymore.

[44]These damages are related to Plaintiffs' fraud claims and not to their breach of contract claim. Plaintiffs also have a breach of contract claim for approximately $4 million. There is no discussion regarding damages and Plaintiffs' breach of contract claim in this motion.

At the parties' pretrial conference, Plaintiffs argued that depending on the valuation method used, Defendants' fraudulent inducement cost Plaintiffs between $6,236,000 and $7,934,000. Plaintiffs then contended that if you consider the value of the shares at the time Plaintiffs finally liquidated the majority of its holdings, the value of their damages could be as high as $12,000,000. Defendants objected to Plaintiffs' inclusion of this amount because neither the theory of damages nor the damages number were contained in Dr. Halaka's report. In addition, Defendants argued that any testimony as to damages by McCarthy was improper because he had not been disclosed as a witness, whether as a lay witness or non-retained expert, on the subject of Plaintiffs' damages.

Now, pursuant to Fed. R. Civ. P. 37(c)(1), Defendants seek to exclude testimony from McCarthy regarding damages because he was not disclosed as an expert witness or as a lay witness with information as to damages. Plaintiffs concede that they did not disclose McCarthy as an expert witness but they assert that they do not intend to call him as an expert. Instead, Plaintiffs state McCarthy will testify as a party and business owner and offer his lay opinion on damages pursuant to Fed. R. Civ. P. 701. Plaintiffs assert that McCarthy's damages calculation is not complicated and involves simple math. In addition, Plaintiffs assert that McCarthy was disclosed as a lay witness with information as to Plaintiffs' claims.

Initially, the Court must consider whether McCarthy's proposed testimony is expert or lay opinion testimony. Defendants contend that it is expert testimony because it involves technical damages methodology that both of the parties' damages experts have addressed and could not be addressed by an ordinary lay person. Plaintiffs argue that McCarthy's testimony is based on simple math because it is only a matter of determining how many additional common shares they should have received in February and how much additional money they would have received had they been

able to sell those additional shares at the same time they sold their other common shares between September 2007 and January 2008.

"When the subject matter of proffered testimony constitutes scientific, technical, or other specialized knowledge, the witness must be qualified as an expert under Rule 702. Rule 701 applies only if the witness is not testifying as an expert."[45] In certain circumstances, a business owner may testify as to lost profits. Pursuant to Fed. R. Civ. P. 701, business owners' testimony is generally admissible if they have "sufficient personal knowledge of their respective businesses *and* of the factors on which they relied to estimate lost profits."[46] In addition, they may testify if the valuation is based on "straightforward, common sense calculations."[47]

Here, the proposed testimony does not appear to involve specialized knowledge but instead seems to be a straightforward mathematical calculation.[48] Plaintiffs allege that because of their inability to convert all of their preferred shares to common shares in February, they did not receive an additional 510,437 common shares. Had Plaintiffs received the additional 510,437 shares of stock, Plaintiffs allege they would have been able to sell those additional shares when they sold their other common shares between September 2007 and January 2008 at an average price of $23.93 a share, resulting in approximately $12 million in damages. Because this appears to be a straightforward mathematical equation, it does not appear that McCarthy's testimony is that of an

---

[45]*LifeWise Master Funding v. Telebank*, 374 F.3d 917, 929 (10th Cir. 2004) (internal quotations omitted).

[46]*Id.*

[47]*Id.* at 929-30.

[48]The Court notes that both parties rely on cases discussing "lost profits." Defendants also argue that McCarthy's proposed testimony is not about "lost profits" and is not based on his personal knowledge of Plaintiffs' operations or lost customers but instead about technical damages methodology issues regarding securities fraud damages relating to a hypothetical exchange of preferred shares. Although the damages here may not be "lost profits" per se, the general principal is still applicable in that McCarthy's computation is not based on specialized knowledge and instead appears to be a basic math calculation.

expert.[49]

Because the Court has determined that McCarthy's proposed testimony is not expert testimony, the Court considers whether McCarthy's testimony should be precluded because Plaintiffs did not specifically identify "damages" as an item that McCarthy would testify about. Generally, under Fed. R. Civ. P. 37(c)(1), "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or harmless." The district court has broad discretion in determining the harmfulness of a Rule 26(a) violation.[50] The court should consider four factors: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness."[51]

Plaintiffs identified McCarthy as a witness testifying about the claims in the case. Defendants cannot seriously claim to be surprised that McCarthy, one of the Plaintiffs in this case, and the CEO of the three other Plaintiffs in this case, would testify as to how he and his companies were damaged. Defendants contend that they are prejudiced and the trial would be disrupted because they would need to reopen discovery to allow their expert to supplement his report, re-depose McCarthy and Defendants' expert, and may have to brief any resulting *Daubert* motions. The Court does not agree as the Court has already concluded that McCarthy's proposed testimony is not expert

---

[49]If McCarthy's testimony would go beyond the calculation identified above, and into a complicated or specialized methodology damages calculation, he would be prevented from so testifying.

[50]*Woodworker's Supply Inc. v. Principal Mut. Life Ins. Co.*, 170 F.3d 985, 993 (10th Cir. 1999).

[51]*Id.*

-18-

testimony, and no questions regarding McCarthy's "methodologies" is needed. The trial is to the bench, and Defendants will be able to question McCarthy during trial. To the extent McCarthy's testimony may go into specialized knowledge or involves flawed mathematical calculations, Defendants may point this out to the Court. Finally, there is no evidence of bad faith on behalf of Plaintiffs. As such, Defendant's motion to exclude McCarthy's testimony as to damages is denied.

**IT IS ACCORDINGLY ORDERED** that Plaintiffs' Motion for Summary Judgment on Defendants' Third Affirmative Defense (Doc. 132) and Defendants' Motion for Summary Judgment on its Third Affirmative Defense (Doc. 141) are **DENIED**.

**IT IS FURTHER ORDERED** that Defendant Golsen's Motion for Summary Judgment (Doc. 139) is **GRANTED**.

**IT IS FURTHER ORDERED** that Defendant LSB's Motion for Summary Judgment on the Breach of Contract Claim (Doc. 137) is **DENIED**.

**IT IS FURTHER ORDERED** that Defendant's Motion to Exclude Testimony of Kent McCarthy (Doc. 147) is **DENIED**.

**IT IS SO ORDERED**.

Dated this 28th day of April, 2011.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE