## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

JAYHAWK CAPITAL
MANAGEMENT, LLC, et al.,

       *Plaintiffs,*

  vs.                           Case No.  08-2561-EFM

LSB INDUSTRIES, INC.,

       *Defendant.*

## MEMORANDUM AND ORDER

Plaintiffs Jayhawk Capital Management, LLC, et al., owned preferred shares of stock issued by Defendant LSB Industries, Inc.  Jayhawk brought suit against LSB for actions the corporation took during two securities transactions that occurred in 2007.  Jayhawk alleges that LSB committed fraud, violated federal and state securities laws, and breached fiduciary duties when LSB made allegedly false statements that induced Jayhawk to exchange only half of its preferred shares for common stock during an exchange offer.  Jayhawk also alleges that LSB breached a contract when LSB refused to pay Jayhawk any dividends at the time Jayhawk converted the remaining half of its preferred shares to common stock.  This Court presided over a bench trial on these claims and took the matter under advisement.  The Court now makes the following findings of fact and conclusions of law, and for the reasons discussed therein, orders that judgment be entered for Defendant LSB Industries, Inc.

# I.      FINDINGS OF FACT

### The Parties

Defendant LSB Industries, Inc., ("LSB") is a Delaware corporation based in Oklahoma City that manufactures and sells commercial and residential climate control products and chemical products.  LSB was founded by Jack Golsen and went public in 1969.  Since that time, Golsen has served as the CEO and Chairman of the Board for the company.  Plaintiffs Jayhawk Capital Management, LLC, Jayhawk Institutional Partners, L.P., and Kent McCarthy ("Jayhawk") were longtime investors in LSB.  McCarthy holds an MBA from Stanford Business School and worked at Goldman Sachs for nine years before forming Jayhawk Capital Management.

After first purchasing common stock in LSB, Jayhawk bought preferred shares in the company.  The preferred shares were LSB's $3.25 Convertible Exchangeable Class C Preferred Stock, Series 2 ("the preferred shares" or "Series 2 Preferred Shares").  In 2006, Jayhawk was the largest preferred shareholder, and when Jayhawk's common shares were included, Jayhawk was LSB's second largest shareholder.  After LSB's board of directors failed to declare dividends on the preferred shares for a number of quarters, Jayhawk was allowed to appoint two of the members on LSB's Board of Directors.  Jayhawk appointed Grant Donovan and Alan Ford, both of whom were friends and former financial advisors to Kent McCarthy.

### The Preferred Shares and the Certificate of Designation

The preferential rights associated with the Series 2 Preferred Shares were set out in a Certificate of Designation ("the Certificate").  Under the terms of the Certificate, the shares were entitled to annual dividends of $3.25 when, and only if, LSB's Board of Directors first declared and set record and due dates for a dividend.  If the board declared a dividend in an amount less

than the total accumulated and unpaid dividends, the amount declared was to be allocated pro rata among all Series 2 Preferred shareholders.

Additionally, the Certificate set out terms for conversion and redemption of the preferred shares. LSB could redeem the preferred shares for fifty dollars per share, plus "an amount in cash equal to all dividends on the [Series 2 Preferred Shares] accrued and unpaid thereon, whether or not declared, pro rata to the date fixed for redemption."[1] The Certificate did not require the board to declare a dividend before redeeming the preferred shares, and it did not contain any language indicating that a redemption operated as a de facto declaration of a dividend. The Certificate did require shareholder approval for a redemption only in the instance where LSB called less than all of the outstanding preferred shares and the shares held accrued and unpaid dividends. If LSB issued a redemption notice, preferred shareholders could elect to convert their shares before the redemption date rather than allowing LSB to redeem the shares.

The Certificate gave the preferred shareholders the right to convert the Series 2 Preferred Shares to common stock at a rate of 4.329 common shares for every preferred share. A shareholder who chose to convert preferred shares to common stock was not entitled to the payment of dividends that had accrued on those shares. The only exception to this rule is found in section 6(c) of the Certificate, and permits the payment of dividends in the limited instance where the board declared a dividend that had a record date prior to, and a due date after, the date of conversion.

Although certain provisions of the Certificate require pro rata treatment for the preferred class, such requirements are tied to specific actions, such as the payment of declared dividends in an amount less than the total accrued. The Certificate does not contain any language requiring

---

[1] Certificate of Designation, Pls.' Ex. 32, p. 5–6, § 5.

LSB or its board to treat all preferred shareholders equally.  The Certificate also lacks any language prohibiting the company from negotiating or engaging in securities exchanges with individual shareholders.

### The Individual Exchange Offers

In 2006, two holders of Series 2 Preferred Shares, Paul Denby and Jim Sight, approached LSB about exchanging their preferred shares for common stock.  LSB did not solicit exchange offers from the shareholders.  Instead, testimony and minutes from the board's October 5, 2006, meeting reflect that there was "an extensive discussion" about the shareholders' proposal.[2]  According to testimony from others, Sight and Denby indicated that they were concerned about the stability of their own financial interests.  Sight and Denby therefore proposed that they be allowed to convert their preferred shares to common at a ratio of 7.4 to 1, and in exchange, "Sight and Denby would each waive and relinquish any and all rights that each may have in and to the accrued and unpaid dividends on the Series 2 Preferred beneficially or held by each of them."[3]  These terms were mutually beneficial because the common stock price was low at the time, and the exchanges eliminated LSB's obligation to pay the dividends that had accrued on the preferred shares.   After consulting LSB's securities counsel, the board of directors unanimously approved the exchange with Sight and Denby.

Other preferred shareholders—many of whom were related to or affiliated with Sight and Denby—then approached LSB to exchange their Series 2 Preferred Shares on the same terms, and the board unanimously approved several of these transactions.  LSB's corporate securities counsel discouraged any further exchanges out of concern that, if the transactions continued,

---

[2]    LSB Board Minutes dated Oct. 5, 2006, Def. Ex. 470, p. 2.

[3]    *Id.*

they could be considered a creeping tender offer.  LSB followed the advice of its counsel, but the remaining preferred shareholders, including Jayhawk, expressed frustration that they could not partake in the deal.  Consequently, LSB explored the possibility of making a self-tender offer whereby the remaining preferred shareholders could exchange their Series 2 Preferred Shares to common stock at the same 7.4 to 1 ratio.

***The Exchange Agreement***

When deliberating whether to engage in a self-tender offer, Jack Golsen became concerned about permitting Jayhawk to exchange all of its preferred shares at the 7.4 to 1 ratio. Golsen cited several reasons for his concern.  First, Golsen and other company officials were concerned that allowing Kent McCarthy to take on any greater role within LSB would jeopardize LSB's business relationships.   In August 2006, just a few months before the individual exchanges occurred, McCarthy had disparaged LSB's management during a telephone conference heard by LSB's employees, lenders, customers, and suppliers.   Afterwards, LSB received a call from its bank, expressing concern about the state of the company and McCarthy's role within it.  As a result, Golsen and others at LSB worried that McCarthy's behavior cast the company in a bad light at a crucial time for the company's financial health.  Golsen's own strained relationship with McCarthy was the second reason Golsen cited for limiting the number of common shares Jayhawk could acquire in a tender offer.  Third, because Jayhawk was LSB's largest preferred shareholder, Golsen was concerned about dilution of ownership for the current common shareholders.  Finally, Golsen told McCarthy that he was concerned that allowing Jayhawk to exchange all of its Series 2 Preferred Shares might limit LSB's ability to use its net operating loss ("NOL") under federal tax laws and regulations.

Golsen, his son, and one of LSB's attorneys met with McCarthy explain to Jayhawk that, in the event LSB went forward with the proposed tender offer, Jayhawk would be limited to exchanging only half of its Series 2 Preferred Shares. Golsen, as the second-largest preferred shareholder, agreed to similarly limit his participation in the tender offer. Golsen, LSB attorney Meridith Lang, and Golsen's son met with McCarthy in Tulsa, Oklahoma, on or around October 26, 2006, to discuss the proposed tender offer. At the time of the meeting, Golsen believed, based on advice from counsel, that he was not legally obligated to go forward with any tender offer. Golsen asked McCarthy to sign an agreement limiting Jayhawk's participation in the tender offer to fifty percent of its preferred shares. Golsen testified that he explained all of his foregoing concerns about Jayhawk exchanging all of its shares. McCarthy contends that Golsen knew McCarthy was a tax-sensitive investor and thus focused on LSB's ability to use the NOL.

As of 2006, LSB had approximately $68 million in NOL, which represented a potential $23 million in tax savings for LSB. Because LSB had begun to return to profitability in 2006, it was making a concerted effort to protect the NOL to offset anticipated profits. The formula for calculating a company's NOL is set out in section 382 of the Internal Revenue Code ("IRC"). Both parties agree that this formula is complicated and involves an analysis of the aggregate ownership shift of all five-percent shareholders and certain "public groups" as measured over a three-year testing period. If the aggregate ownership shift over that period is greater than fifty percent, a company's ability to use the NOL is limited.

Due to the complex, probabilistic, and shifting nature of the NOL calculation, neither Golsen nor LSB could know for certain whether the NOL would be adversely affected if Jayhawk exchanged all of its shares. Prior to meeting with McCarthy, Golsen received an e-mail from LSB's accountant at Ernst & Young in which the accountant predicted that there would be

"tons of cushion" between the ownership change that would result from Jayhawk exchanging all of its shares in the tender offer and the fifty-percent ceiling needed for LSB to take full advantage of the NOL.  But in addition to the fact that the e-mail chain that reached Golsen contained conditional language,[4] it is unclear from the accountant's e-mail what factors the he was asked to take into consideration to reach his conclusion.  As LSB's expert, Alan Barton, testified, other events could take place in the three-year calculation period that could amount to a fifty-percent ownership change as defined in section 382 of the IRC.  For example, the common stock that Jayhawk would acquire in the tender offer had greater liquidity than the preferred shares, and sales or liquidation of that stock in the next three years could cause more ownership shift.  Given the difficulty, if not the impossibility, of predicting whether a particular transaction will adversely affect a company's NOL, the Court finds credible Golsen's testimony that he believed the stated concerns to McCarthy that "there *could* potentially be a problem" if Jayhawk exchanged all of its preferred shares.[5]  Moreover, e-mails that Jayhawk's Chief Financial Officer, Mike Schmitz, sent to LSB reflect Schmitz's understanding "that LSB did not represent that there would be an effect on their NOL, [but] that LSB represented that the NOLs could be in jeopardy if the Jayhawk Group converted all of their shares."[6]  The Court therefore finds that Golsen told McCarthy the NOL *could*, not would, be adversely affected if Jayhawk exchanged all of its preferred shares for common stock at a ratio of 7.4 to 1.

---

[4]    *See* E-mail from Jim Jones dated October 24, 2006, Pls.' Ex. 33 ("[The accountant's] first reaction was *not likely* to be a problem."  (Emphasis added)).  Golsen testified that he did not remember seeing that e-mail prior to meeting with McCarthy, but because the e-mail was sent two days before the meeting in Tulsa, the Court will assume Golsen did receive the e-mail.

[5]    Golsen Test., Trial Tr. vol. III (Doc. 194), at 68–69 (emphasis added).

[6]    E-mail from Mike Schmitz dated March 17, 2007, Def. Ex. 437.

Nevertheless, McCarthy testified that he agreed to the terms of the Exchange Agreement proposed by Golsen and LSB because he believed that LSB's ability to use the NOL *would* be in jeopardy if Jayhawk exchanged all of its preferred shares for common stock.  McCarthy and Jayhawk agreed that if LSB conducted a tender offer or other exchange of the Series 2 Preferred Shares at the 7.4 to 1 ratio within one year from the date the agreement was signed, Jayhawk would only be entitled to exchange approximately fifty-two percent of its preferred shares.  The Exchange Agreement also limited Golsen, his family, and the entities he controlled to exchanging the same percentage of preferred shares.  At the time the parties signed the Exchange Agreement, LSB had not decided whether it would engage in the tender offer, and the Agreement was written in terms that reflected that uncertainty.  McCarthy testified that his acquiescence to the terms of the Exchange Agreement was conditioned on LSB's promise to verify that effect of Jayhawk's full participation in any proposed tender offer on the NOL.  But neither the Agreement nor the evidence presented at trial support McCarthy's assertion.

Finally, the Court finds credible Golsen's unequivocal testimony that there were no circumstances under which LSB would have allowed Jayhawk to convert all of its preferred shares to common stock at the 7.4 to 1 ratio.  If Jayhawk had refused to agree to the limitations set out in the Exchange Agreement, LSB would not have proceeded with the exchange offer.

### The March 2007 Exchange Offer

Because Jayhawk did sign the Exchange Agreement, LSB ultimately went forward with the exchange offer, whereby preferred shareholders could exchange their Series 2 Preferred Shares for common stock at the 7.4 to 1 ratio, so long as the shareholders waived their right to collect accrued and unpaid dividends on those shares.  As required under the terms of the Exchange Agreement, LSB first solicited a fairness opinion on the terms of the exchange offer

from an independent investment bank.  The bank found the exchange offer to be financially fair and in the best interests of LSB's shareholders.  The bank did not opine on the fairness of the Exchange Agreement with Jayhawk.  LSB's Board of Directors subsequently approved the exchange offer.  No dividends were declared or paid in connection with the exchange offer. When the exchange offer took place in March 2007, Jayhawk exchanged 180,450 Series 2 Preferred Shares for common, leaving Jayhawk with 155,012 remaining preferred shares.

### The August 2007 Redemption

After the exchange offer, the only outstanding Series 2 Preferred Shares belonged to Jayhawk and Golsen.  In July 2007, LSB authorized a redemption of all remaining preferred shares to be completed in August 2007.  Pursuant to the terms of the Certificate of Designation, LSB would redeem the outstanding shares for $50 per share plus a cash payment equal to the accrued and unpaid dividends on those shares.  LSB sent the remaining preferred shareholders a redemption notice that outlined the terms of the redemption and notified the shareholders that they had the right to convert their shares prior to the redemption date in lieu of permitting LSB to redeem the shares.  The notice informed the shareholders that they would not be entitled to any accrued dividends if they elected conversion, as the board would not declare a dividend before the redemption date.  Jayhawk elected to convert all of its remaining Series 2 Preferred Shares to common stock at the 4.329 to 1 ratio set out in the Certificate rather than permit them to be redeemed pursuant to the terms announced by LSB.  Golsen's shares, however, were all redeemed.  In accordance with the Certificate and the redemption notice, Jayhawk did not receive any dividend payments or cash amount equal to the accrued and unpaid dividends on the shares it converted, but Golsen received a cash payment equal to the amount of accrued and unpaid dividends on his redeemed shares.

### Settlement of the Present Claims

During the March 2007 tender offer,  Kent McCarthy gifted to the University of Kansas ("KU") a number of LSB Series 2 Preferred Shares previously held by Jayhawk.  LSB contended that the gifted shares were subject to the limitations of the previously executed Exchange Agreement.  In 2008, KU asserted claims against LSB because it was unable to exchange its shares at the 7.4 to 1 ratio.  Although Jayhawk had not filed any lawsuits against LSB at that time, Jayhawk's General Counsel and Chief Operating Officer, Jim McMullen, offered to engage in settlement negotiations related to the KU claims.

LSB's outside counsel, Bruce Collins, testified that he had a telephone conversation with McMullen in which the two lawyers discussed the possibility of simultaneously settling KU's claims against LSB and any prospective claims between Jayhawk and LSB.  No record of that telephone call was produced, but Collins left the conversation with the belief that Jayhawk had presented an offer that would settle all of the actual and prospective claims against LSB.  Collins testified that McMullen proposed a settlement offer whereby LSB and Jayhawk would each pay KU $200,000 to settle the KU claims, and LSB would pay Jayhawk an additional $100,000 to settle Jayhawk's present suit.  Collins further testified that he spoke with LSB and then called McMullen and accepted the alleged offer.  LSB argues that Jayhawk's claims against LSB were settled at that time.

Jim McMullen offered conflicting testimony.  According to McMullen, Jayhawk had not even threatened a lawsuit against LSB at the time KU filed suit.  McMullen acknowledged that he spoke with Collins about settling the KU lawsuit, but McMullen testified that the two attorneys never discussed any prospective claims from Jayhawk, let alone an offer to settle any such claims.  McMullen further testified that he told Collins that anything the two attorneys

discussed would have to be relayed and approved by McCarthy because "he own[ed] the company and he was the decision-maker."[7]   According to McMullen, he had no authority to settle any claims on Jayhawk's behalf, and "[t]here was never any settlement."[8]

The parties submitted e-mail exchanged between McMullen and LSB's attorney.  That e-mail exchange begins with Collins setting out the terms of a settlement.  In his replies, McMullen never acquiesced to those terms; instead, he repeatedly indicated that he needed to talk with Kent McCarthy before proceeding.   A few days later, McMullen sent an e-mail stating, "It is [Jayhawk's] view that this matter has not been settled—Kent specifically re-iterated this point to me."[9]  LSB now argues that it believed McMullen, as Jayhawk's General Counsel and COO, had authority to settle these matters and had done so.

## II.   CONCLUSIONS OF LAW

Jayhawk claims it is entitled to relief from LSB under six theories of law, including: (1) fraudulent inducement, (2) fraud, (3) securities fraud under section 10(b) and regulation 10b-5 of the Securities Exchange Act, (4) Kan. Stat. Ann. § 17-12a501, (5) breach of fiduciary duty, and (6) breach of contract.  For reasons discussed *infra*, the Court finds that Jayhawk cannot prevail on any of its claims.  First,  Jayhawk's first five claims dealing with LSB's alleged fraud and breach of fiduciary duty lack merit because Jayhawk cannot prove that it was harmed by any allegedly fraudulent actions by LSB.   Second, after reading the plain language the parties' Certificate of Designation, the Court finds that LSB did not breach any contract when it declined to pay Jayhawk any dividends.   Finally, the Court rejects LSB's defense that the parties previously settled this lawsuit.

---

[7]    McMullen Test., Trial Tr. vol. IV (Doc. 195), at 122.

[8]    *Id.* at 125.

[9]    E-mail from Jim McMullen dated June 23, 2008, Def. Ex. 432.

## A.     Choice of Law and Legal Standards for Jayhawk's Claims

The parties dispute the choice of law to be applied to Jayhawk's claims, particularly Jayhawk's claim of breach of fiduciary duty.  Therefore, as a preliminary matter, the Court will make choice of law determinations and delineate the elements applicable to each claim for relief.

### 1.     Common Law Fraud Claims

Jayhawk has brought claims for relief under the common law torts of fraud and fraudulent inducement.  The parties agree that Kansas law governs the adjudication of these common law torts.  According to Kansas common law, causes of action for fraud and fraudulent inducement require the plaintiff to prove, by clear and convincing evidence,[10] the same five elements: (1) a false statement of material fact; (2) known to be false by the party making it, or made with reckless disregard for the truth; (3) made with the intent to induce the other party into acting upon the statement; (4) upon which the other party justifiably relied; and (5) sustained damage as a direct result of such reliance.[11]

### 2.     Breach of Fiduciary Duty Claim

Jayhawk also alleges that LSB, as a corporation, breached fiduciary duties owed to Jayhawk as a shareholder.  The parties disagree as to whether Kansas or Delaware law applies to the merits of that claim.  Procedurally, when a conflict of laws issue arises in a case that is before the district court due to diversity of citizenship, the court applies the choice of law rules of the forum state—in this case, Kansas.[12]  Focusing on the tortious nature of its breach of fiduciary

---

[10]     *See Alires v. McGehee*, 85 P.3d 1191, 1195 (Kan. 2004).

[11]     *See Bomhoff v. Nelnet Loan Services, Inc.*, 109 P.3d 1241, 1246 (Kan. 2005) (citation omitted); *Newcastle Homes, LLC v. Thye*, 241 P.3d 988, 998 (Kan. Ct. App. 2010) (citing the Pattern Instructions for Kansas, PIK Civ. 4th 127.40, when listing the elements of fraudulent inducement).

[12]     *See Mirville v. Mirville*, 10 Fed. App'x 640, 643 (10th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)).

duty claim, Jayhawk invokes the rule of *lex loci delicti* and argues that Kansas law applies because Jayhawk suffered damages in Kansas.[13]  But the Court agrees with LSB's contention that Jayhawk's claim centers on the duties and liabilities of a corporation to its investors.  Because Jayhawk's claim relies on the duties and relationships defined in corporate law, "the [C]ourt must look to Kansas' corporate conflicts of law rule and not to its general tort conflicts of law rule."[14]  In Kansas, "[t]he generally accepted rule is that a corporation's charter and the laws of its domicile govern with respect to . . . the rights and liabilities of its officers, stockholders, and directors."[15]  Because LSB Industries is a Delaware corporation, the Court must apply Delaware law when adjudicating Jayhawk's breach of fiduciary duty claim.[16]

Under Delaware law, a plaintiff claiming a breach of fiduciary duty must prove (1) that a fiduciary duty existed between the parties; (2) that the defendant breached that duty by committing an unfair, fraudulent, or wrongful act; and (3) that the breach proximately caused the plaintiff damage or unjustly enriched the defendant.[17]  Delaware law protects directors and officers of a corporation under the business judgment rule—a presumption that those managing a corporation act on an informed basis, in good faith, and with the honest belief that their actions

---

[13]    *See, e.g.*, *Anderson v. Commerce Const. Services, Inc.*, 531 F.3d 1190, 1194 (10th Cir. 2008) ("In tort cases, Kansas courts have long applied the traditional lex loci delicti choice of law rule.  According to this rule, the law of the state where the tort occurred governs the merits of the litigation."  (Internal citation omitted.)).

[14]    *Brown v. Mailman*, 1995 WL 716785, at *3 (D. Kan. Nov. 13, 1995) (holding that Missouri law applied to the plaintiff's breach of fiduciary duty claim because "it is corporate law that defines the contours of that duty").

[15]    *Consol. Beef Indus., Inc. v. Schuyler*, 716 P.2d 544, 547 (Kan. 1986), *accord Waddell & Reed Fin., Inc. v. Torchmark Corp.*, 337 F. Supp. 2d 1243, 1250 (D. Kan. 2004).

[16]    *See Waddell & Reed*, 337 F. Supp. 2d at 1250 ("Because Torchmark and W & R Financial are Delaware corporations, the Court applies Delaware law.").

[17]    *See Beard Research, Inc. v. Kates*, 8 A.3d 573, 601–02 (Del. Ch. 2010); *see also Oberly v. Kirby*, 592 A.2d 445, 463 (Del. 1991) ("It is an act of disloyalty for a fiduciary to profit personally from the use of information secured in a confidential relationship, even if such profit or advantage is not gained at the expense of the [beneficiary].  The result is nonetheless one of unjust enrichment . . . .").

will benefit the corporation.[18]  The plaintiff bears the burden of overcoming this presumption by showing that the corporation's managers breached their fiduciary duties by acting "intentionally, in bad faith, or for personal gain."[19]  In other words, to prove its claim of breach of fiduciary duty, Jayhawk must show that (1) LSB owed a fiduciary duty to Jayhawk, (2) LSB breached that duty by intentionally acting in bad faith, and (3) Jayhawk suffered damage, or LSB was unjustly enriched, as a direct result of LSB's actions breaching its fiduciary duty.

### 3. *Statutory Claims*

Jayhawk's next causes of action relate to LSB's alleged misrepresentation of the status of the company's NOL are Jayhawks claims that LSB violated certain provisions of the Securities Exchange Act, Securities Exchange Commission regulations, and the Kansas Uniform Securities Act.  The parties do not dispute the law applicable to these claims—federal law clearly controls the application and enforcement of federal statutes, while Kansas law applies to causes of action brought under Kansas statutes.

The federal and state statutes under which Jayhawk sues are similar.  Section 10(b) of the Securities Exchange Act of 1934 gives the Securities Exchange Commission the power to promulgate rules that prohibit the use of "any manipulative or deceptive device or contrivance" in connection with the purchase or sale of securities.[20]  Rule 10b-5, the SEC's parallel regulation, makes it unlawful for any person "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."[21]  To establish liability under

---

[18]  *Ryan v. Gifford*, 918 A.2d 341, 357 (Del. Ch. 2007).

[19]  *Id.*

[20]  15 U.S.C. § 78j(b).

[21]  17 C.F.R. § 240.10b-5(b).

section 10(b) and Rule 10b-5, Jayhawk must prove the following elements: (1) LSB made an untrue statement of material fact, (2) the statement was made in connection with the purchase or sale of a security, (3) scienter, (4) Jayhawk reasonably relied on the misrepresentation, and (5) damage to Jayhawk as a proximate cause of LSB's misrepresentation.[22]  Jayhawk must prove these same elements to prevail on his claim under Kan. Stat. Ann. § 17-12a501, which uses language identical to Rule 10b-5.[23]  For that reason, Kansas courts have analyzed federal and state securities-fraud claims simultaneously.[24]

### 4.    *Breach of Contract Claim*

Unrelated to its claim that LSB misrepresented the status of the company's NOL, Jayhawk contends that LSB breached its contractual duty under the Certificate of Designation to pay dividends when Jayhawk converted its remaining Series 2 Preferred shares in August 2007. Kansas law includes two rules for conflict-of-laws issues related to contracts.  In the absence of a choice-of-law provision in the contract itself, Kansas courts generally apply the rule of *lex loci contractus*.  "In most instances, this means courts apply the substantive law of the state where the contract was made, although in some instances, the courts look to the place of performance."[25] Because the parties did not introduce evidence regarding the location where the Certificate of

---

[22]    *See Anixter v. Home-Stake Production Co.*, 77 F.3d 1215, 1225 (10th Cir. 1996).

[23]    Kansas Statutes Annotated section 17-12a501 states, in relevant part: "It is unlawful for a person, in connection with the offer, sale, or purchase of a security. . . to make an untrue statement of a material fact, or omit to state a material fact necessary in order to make a statement made, in the light of the circumstances under which it is made, not misleading."

[24]    *See, e.g.*, *Artst v. Stifel, Nicolaus & Co., Inc.*, 86 F.3d 973, 980–81 & 980 n.6 (10th Cir. 1996) (analyzing only the plaintiff's Rule 10b-5 claim in the text of the opinion, but noting in a footnote that the language of the Kansas statute "closely tracks that of Rule 10b-5"); *Comeau v. Rupp*, 810 F. Supp. 1127, 1157 (D. Kan. 1992) (summarily denying the plaintiffs' claims under the Kansas statute after denying the Rule 10b-5 claims because the state statute "closely tracks the language of Rule 10b-5, and the [plaintiffs] themselves contend[ed] that the state and federal causes of action have identical elements").

[25]    *Dragon v. Vanguard Indus., Inc.*, 89 P.3d 908, 914 (Kan. 2004); *see also Layne Christensen Co. v. Zurich Canada*, 38 P.3d 757, 766 (Kan. Ct. App. 2002) (citations omitted).

Designation was made, or make arguments about where the contract was performed, the Court will abide by the parties' agreement in the Pretrial Order that Kansas substantive law applies to Jayhawk's breach-of-contract claim.[26]  Accordingly, Jayhawk bears the burden of proving, by a preponderance of the evidence, each of the following: (1) a contract between the parties, (2) sufficient consideration, (3) that Jayhawk did, or was willing to, comply with the contract's terms, (4) LSB breached the contract, and (5) Jayhawk sustained damages as a result of the breach.[27]

**B.      Fraud and Breach of Fiduciary Duty Claims Arising from the Exchange Offer**

Jayhawk's claims against LSB for fraudulent inducement, fraud, statutory securities fraud, and breach of fiduciary duty arise from LSB's March 2007 self-tender and the events leading to that exchange offer.  Specifically, Jayhawk alleges that LSB committed fraud and breached fiduciary duties by misrepresenting the effect that Jayhawk's full participation in the exchange offer would have on LSB's ability to use its NOL.  Jayhawk alleges that LSB knowingly made these false statements about the NOL to induce Jayhawk to enter into the Exchange Agreement and agree to limit the number of Series 2 Preferred Shares that Jayhawk could exchange for common stock at the 7.4 to 1 ratio.  Jayhawk contends that its inability to exchange all of its shares cost Jayhawk approximately $6,236,150 in lost profits.[28]

The Court finds that LSB is not liable to Jayhawk for the following reasons.  First, Jayhawk's breach of fiduciary duty claim fails because LSB, as a corporation, cannot be held

---

[26]      *See* Pretrial Order, Doc. 134, p. 3 ("[T]he parties believe and agree the substantive issues in this case are governed by the following law: . . . Kansas substantive law regarding fraud, fraudulent inducement, breach of contract, and defenses thereto.").

[27]      *See Reed v. Philip Roy Fin. Services, LLC*, 546 F. Supp. 2d 1219, 1227 (D. Kan. 2008) (citing *City of Andover v. Sw. Bell Telephone, L.P.*, 153 P.3d 561, 565 (Kan. Ct. App. 2007) (citing the pattern jury instruction)).

[28]      *See* Hakala Test., Trial Tr. vol. II (Doc 193), at 92.

liable for breach of fiduciary duty.  Second, the fraud-based claims also fail because Jayhawk cannot prove that it reasonably relied on LSB's statements about the NOL.  Third, and alternatively, Jayhawk's breach of fiduciary duty claim and all of its fraud-based claims fail because Jayhawk cannot prove that it suffered damages as a proximate cause of LSB's alleged misrepresentations about the NOL.  The Court will discuss each of these holdings in turn.

### 1.     *LSB, as a corporation, cannot be held liable for breach of fiduciary duty.*

Jayhawk initially asserted its claim for breach of fiduciary duty against both LSB and its CEO, Jack Golsen.  The Court, however, granted Golsen's motion for summary judgment on the claims against him on the grounds that this Court did not have personal jurisdiction over Golsen.[29]  As a result, Jayhawk's claim for breach of fiduciary duty lies only against LSB.  But corporate entities do not owe any fiduciary duties to shareholders, and therefore Jayhawk's claim lacks merit.

Under Delaware law, "a breach of fiduciary duty claim must be based on an actual, existing fiduciary relationship between the plaintiff an the defendants at the time of the alleged breach."[30]  Directors and officers of a corporation owe fiduciary duties of care and loyalty to the corporation, and in certain circumstances, to individual shareholders like Jayhawk.[31]  But a corporation enjoys a legal identity that is wholly separate from its directors and officers.[32]  In the same way that a person cannot be his or her own fiduciary, that separate corporate entity owes no fiduciary duties to itself or its shareholders.[33]  The logic underlying the principle that directors

---

[29]     *See* Memorandum & Order dated April 28, 2011, Doc. 165, p. 10–14, 19.

[30]     *Omnicare, Inc. v. NCS Healthcare, Inc.*, 809 A.2d 1163, 1169 (Del. Ch. 2002).

[31]     *See* 1 Wm. M. Fletcher, *Fletcher Cyclopedia of the Law of Corporations* § 848 (Rev. ed. 2011)

[32]     *See id.* § 25; *Gottlieb v. Sandia Am. Corp.*, 452 F.2d 510, 514 (3d Cir. 1971).

[33]     *See Arnold v. Soc. for Sav. Bancorp, Inc.*, 678 A.2d 533, 539 (Del. 1996) (stating that Delaware courts have not held a corporation directly liable for breach of fiduciary duty).

and officers, rather than corporations, may be found liable for breach of fiduciary duty lies in the nature of the action.   Because the cause of action arises from a misuse of corporate control, "claims of fiduciary duty ultimately rest on the proposition that a corporate fiduciary has caused the corporation to do something at odds with its own best interests."[34]   The law places responsibility for such misuse of corporate power on the party that abused the fiduciary relationship—the directors and officers.

Jayhawk cites an unpublished opinion, *Behrens v. United Investors Management Co.*, issued by Delaware Chancery Court almost twenty years ago, for the proposition that the disclosure duties applicable to corporate directors "may be seen as a corporate obligation as well."[35]   The full quotation from that case, however, reads: "That [disclosure] obligation may be seen as a corporate obligation as well, *but the primary duty is that of the directors*."[36]   The court's equivocal language and ultimate endorsement of the principle that directors owe disclosure duties severely undercuts Jayhawk's argument.   Furthermore, the Delaware Supreme Court declined to give any weight to the chancery court's holding in *Behrens*.[37]   In fact, the court in *Arnold* expressly dismissed a party's argument that a corporation can be held directly liable for breach of the fiduciary duty of disclosure, citing several Delaware cases and stating:

> Plaintiff has not cited a single case in which Delaware courts have held a corporation directly liable for breach of the fiduciary duty of disclosure. Fiduciary duties are owed by the directors and officers to the corporation and its stockholders.  This Court has stated: "The only defendant is the corporate entity . . . so there are no fiduciary duty claims."   Plaintiffs cite only a single line of

---

[34]   *Sample v. Morgan*, 935 A.2d 1046, 1059 (Del. Ch. 2007).

[35]   Pls.' Response Brief, Doc. 200, p. 3 (citing *Behrens v. United Investors Mgmt. Co.*, 1993 WL 400209, at *11 (Del. Ch. Oct. 1, 1993)).

[36]   *Behrens*, 1993 WL 400209, at *11 (emphasis added).

[37]   *See Arnold*, 678 A.2d at 539 & 539 n.12.

dictum from a 1993 Court of Chancery case [*Behrens*], and Federal Rule 14a–9 cases under section 14(a) of the 1934 Act.[38] Following Delaware's precedent, this Court rejects Jayhawk's argument that LSB can be directly liable to Jayhawk for breach of fiduciary duty.

Furthermore, a corporation cannot be held vicariously liable for the actions of its officials because directors and officers do not act as agents of their corporation.[39]  In this case, therefore, LSB is not vicariously liable for any statements its directors or officers made regarding the NOL. Jayhawk attempts to circumvent the Delaware Supreme Court's clear holding on this point by arguing that "Mr. Golsen *was* LSB."[40]  Although evidence does suggest that Golsen, as a controlling shareholder and CEO, had a great deal of influence over the decisions made about LSB, Jayhawk did not present sufficient factual or legal support for this Court to find that LSB was Golsen's alter ego.  And even if Jayhawk could prove that there is such unity between Golsen and LSB that the corporation should not be considered a separate entity, the remedy under the alter ego doctrine is to disregard LSB as a corporate entity and hold Golsen, who is no longer a party to this suit, responsible for the actions done in the name of the corporation.[41]

In conclusion, LSB, as a corporate entity wholly separate from its directors and officers, owes no fiduciary duties to Jayhawk.  Because Jayhawk cannot prove this first element of its cause of action against LSB for breach of fiduciary duty, Jayhawk is not entitled to relief.

---

[38]  *Id.* at 539.

[39]  *See id.* at 539–40 (citing Restatement (Second) of Agency § 14C (1958)).

[40]  Pls.' Response Brief, Doc. 200, p. 3.

[41]  *See* Fletcher, *supra* note 31, at § 41.10.

   2.   ***Jayhawk did not prove its fraud-based claims because Jayhawk's reliance on the alleged misrepresentations about the NOL were unreasonable.***

Each of Jayhawk's claims based on fraud require Jayhawk to prove that it reasonably relied on a false statement.[42]   The Court will assume *arguendo* that Golsen told Jayhawk that LSB's ability to use its NOL would be adversely affected if Jayhawk exchanged all of its Series 2 Preferred Shares for common at a rate of 7.4 to 1.   According to Jayhawk, that statement about the NOL induced Jayhawk to agree to exchange only half of its preferred shares.   The Court disagrees.

Jayhawk has not met the SEC's low burden of proving such reasonable reliance by a preponderance of the evidence, let alone the more onerous clear and convincing standard required by Kansas state law.[43]   McCarthy was not a naïve investor.   He held an MBA from Stanford Business School, worked at Goldman Sachs for nearly a decade, taught a business class at KU, formed Jayhawk Capital Management, and managed multiple investment funds for many years.   From his testimony, it is clear that McCarthy was a highly sophisticated and skilled investor.   McCarthy knew of the difficulty associated with calculating a company's prospective ability to use an NOL; McCarthy referred to the NOL calculation as "complex" or "complicated"

---

[42]   *See FDX Supply Chain Svcs., Inc. v. North Face, Inc.*, 98 F. Supp. 2d 1244, 1247 (D. Kan. 2000) (stating that Kansas law requires the party alleging fraudulent inducement to show that it reasonably relied and acted upon the defendant's statements); *Comeau*, 810 F. Supp. at 1146, 1157 (stating that "[j]ustifiable reliance on the misrepresentation or omission is a necessary element to liability under § 10(b) and Rule 10b-5," and that failure to prove justifiable reliance means the plaintiff's claim under the Kansas Securities Act also fails because the state and federal regulations have identical elements); *Kelly v. VinZant*, 197 P.3d 803, 808 (Kan. 2008) (stating that common-law fraud requires proof by clear and convincing evidence that the plaintiff reasonably relied and acted upon the defendant's representations).

[43]   *Compare Comeau*, 810 F. Supp. at 1146 ("The plaintiffs have the burden of establishing every element of their § 10(b) and Rule 10b-5 claim by a preponderance of the evidence."), *and Kelly*, 197 P.3d at 808 (stating that the elements of an action for fraud require proof by clear and convincing evidence).

at least seven times during his testimony.[44]  It is not reasonable for an experienced investor to rely on a single representation about a complex tax issue when making investment decisions.[45]

In fact, an e-mail from Jayhawk CFO Mike Schmitz contradicts McCarthy's claim that Jayhawk relied solely on the NOL issue when deciding whether to enter the Exchange Agreement. McCarthy testified that Jayhawk would not have signed the Exchange Agreement absent Golsen's representations regarding the loss of the NOL[46] but Schmitz told LSB's attorneys:

> Kent [McCarthy] took the multiple factors that you mentioned into account when making the agreement. . .  he would not have agreed to convert less than our full amount without those factors.  We would not ask the company to agree to something that would negatively impact their NOLs, bank relationships, or sales contracts.[47]

In other words, Schmitz told LSB that the NOL was not the sole factor Jayhawk relied upon when entering the Exchange Agreement; Jayhawk also acted in reliance on Golsen's other concerns about Jayhawk acquiring more common stock.

Even if Golsen's representations about the NOL were the determining factor for Jayhawk, McCarthy's own testimony reflects a healthy degree of skepticism for the proposition that Jayhawk's full participation in the exchange would adversely affect LSB's use of the NOL. McCarthy testified that he told Schmitz to make sure Schmitz saw "the calculation for the NOL issue."[48]  When asked whether McCarthy trusted Golsen's representation that there was an NOL

---

[44]    *See* McCarthy Test., Trial Tr. vol. I (Doc. 192), at 108, 110, 181, 182, 235.

[45]    *See, e.g.*, *In re Resorts Int'l, Inc.*, 181 F.3d 505, 510 (3d Cir. 1999) ("Courts often impose a stricter standard of reasonable reliance on sophisticated business persons.").

[46]    *See* McCarthy Test., Trial Tr. vol. I (Doc. 192), at 107 (stating that "[t]here would be no reason for Jayhawk to sign an agreement" absent Mr. Golsen's representations about the NOL).

[47]    E-mail from Mike Schmitz dated March 17, 2007, Def. Ex. 437.

[48]    McCarthy Test., Trial Tr. vol. I (Doc. 192), at 104.

issue, McCarthy responded, "Yes, but I wanted to see verification of it."[49]  And yet, McCarthy signed the Exchange Agreement without ever looking at an NOL calculation or even reading the agreement.  If McCarthy's relationship with Golsen at the time of the meeting could be best described using a Reaganism from the Cold War, acting in blind reliance on Golsen's representations is hardly reasonable.  Consequently, the Court finds that Jayhawk did not reasonably rely on the alleged misrepresentations about LSB's ability to use its NOL in the event Jayhawk exchanged all of its preferred shares for common stock.  Accordingly, LSB is not liable to Jayhawk on any of Jayhawk's fraud-based claims.

###    3.    *Jayhawk did not prove that it was damaged as a result of LSB's alleged misrepresentations about the NOL.*

Alternatively, the Court also finds that Jayhawk's claims based on fraud and breach of fiduciary duty all fail because Jayhawk cannot prove that it suffered damage as a result of LSB's alleged misrepresentations about the NOL.  Jayhawk's claims for relief on the grounds of fraudulent inducement, fraud, section 10(b) and Kan. Stat. Ann. § 17-12a501 violations, and breach of fiduciary duty each require proof that LSB made a false statement of fact and that Jayhawk suffered injury or damages after acting on that false statement.[50]  Jayhawk contends that it was harmed when it agreed to convert only half of its preferred shares during LSB's exchange offer after reasonably relying on LSB's allegedly false representations about its NOL status.  In response, LSB points to Golsen's testimony that LSB would not have made the tender offer if

---

[49]    *Id.* at 106.

[50]    *See Dronsejko v. Thornton*, 632 F.3d 658, 665 (10th Cir. 2011) (stating that a claim under Section 10(b) of the Exchange Act and Rule 10b-5 requires that the plaintiff suffered damages); *FDX Supply Chain Svcs., Inc.*, 98 F. Supp. 2d at 1247 (stating that Kansas law requires a claimant alleging fraudulent inducement to show that the claimant was damaged after relying on a fraudulent statement); *Kelly*, 197 P.3d at 808 (stating that an element of fraud in Kansas law is damage to the claimant); *Oberly*, 592 A.2d at 463 (stating that breach of fiduciary duty claims do not require specific financial loss, but noting that such a breach must necessarily result in unjust enrichment).

Jayhawk did not agree to exchange only half its shares.[51]  Therefore, argues LSB, Jayhawk was not harmed by LSB's alleged NOL misrepresentation because if Jayhawk had not entered the exchange agreement, no exchange offer would have occurred and Jayhawk would be in a worse financial position having not converted any shares at all.

Jayhawk, however, argues that the one-off exchange offers between LSB and select individual shareholders created a creeping tender offer that required LSB to either make an exchange offer to all of the preferred shareholders or risk sanctions for violating certain provisions under the Securities and Exchange Act.  LSB admits that it was counseled to cease the individual transactions to avoid a possible creeping tender offer, but contends that it "did not believe it was obligated or committed to go forward with a tender offer or to exchange any more Preferred Shares at the 7.4 to 1 ratio."[52]  LSB further argues that the creeping tender offer theory of liability is not widely recognized by the courts, and that even if the Court does accept the theory, it does not apply to the issuer of securities or to entities that did not solicit the exchange.

The Court agrees that Jayhawk cannot show damages or injury unless LSB was required to make the exchange offer and treat all of the preferred shareholders equally during the exchange.  The Court has already made a finding of fact that LSB did not plan to proceed with the exchange offer if Jayhawk did not agree to limit the number of preferred shares it would exchange for common stock at the 7.4 to 1 ratio.  Whether LSB could, under the law, condition the exchange offer on the Exchange Agreement remains unresolved.  The Court must therefore determine (1) whether LSB was required under the law to proceed with the exchange offer due to the initial one-off exchanges with individual preferred shareholders, and (2) whether LSB could

---

[51]  *See* Golsen Test., Trial Tr. vol. III (Doc. 194), at 96.

[52]  Def.'s Proposed Findings of Fact & Conclusions of Law, Doc. 197, p. 7, ¶ 25.

treat Jayhawk differently than the other preferred shareholders by requiring Jayhawk to sign the Exchange Agreement.

> ### a. LSB was not required to make an exchange offer as a result of the individual securities transactions.

The 1960s saw a dramatic increase in the use of tender offers as a method for proxies to take control of a corporation.[53]  In an effort to regulate and protect all parties to a tender offer, Congress enacted the Williams Act as an amendment to the Exchange Act.[54]  The Williams Act added five sections to the Exchange Act[55] to provide shareholders of the issuing corporation with the necessary time and information to properly consider the offer, ensure that the shareholders were treated fairly, and guarantee that the issuer and bidder were dealing at arm's length.[56]

One section of the Williams Act, section 13(e),[57] provides that it is unlawful for an issuer of securities to purchase its own securities in contravention of SEC rules and regulations.[58]

---

[53]  *See Piper v. Chris-Craft Indus.*, 430 U.S. 1, 22 (1977).

[54]  Pub. L. No. 90-439, 82 Stat. 454 (1968) (codified at 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(f)).

[55]  The Williams Act added sections 13(d)–(e) and 14(d)–(f), which were amended in 1970 and are now codified at 15 U.S.C. §§ 78m(d)–(e), 78n(d)–(e).  3 Thomas L. Hazen, *Treatise on the Law of Securities Regulation* § 11.1[2] (6th ed. 2009).  Briefly stated, section 13(d) regulates large acquisitions of securities in a manner other than a tender offer by a third party. 15 U.S.C. § 78m(d).  Section 13(e) governs an issuing corporation's acquisition of its own securities. *Id.* § 78m(e).  Section 14(d) governs third-party tender offers, *id.* § 78n(d), section 14(e) prohibits fraud during tender offers, *id.* § 78n(e), and section 14(f) governs third-party transactions subject to sections 13(d) and 14(d) that contain private agreements about the transfer of corporate control, *id.* § 78n(f).

[56]  *See Piper*, 430 U.S. at 29–31.

[57]  Most provisions of the Williams Act that deal with tender offers are found in sections 14(d), 14(e), and 13(e) of the Exchange Act.  *See Fla. Commercial Banks v. Culverhouse*, 772 F.2d 1513, 1515 (11th Cir. 1985).  But section 13(e) is the only section that applies to the facts of this case.  As LSB correctly states in its post-trial brief, section 14(d) does not apply in this case because LSB was both the purchaser and issuer of the securities.  *See* 15 U.S.C. § 78n(d)(8)(B) (stating that section 14(d) does not apply to "any offer for, or request or invitation for tenders of, any security . . . by the issuer of such security").  Although section 14(e) addresses fraud during tender offers, the very misconduct alleged in this suit, it is immaterial to the question at hand—whether LSB's one-off exchanges with individual investors created a legal obligation for LSB to make a formal exchange offer.  Furthermore, prior to filing its post-trial brief, Jayhawk never asserted a cause of action under section 14(e). *See Polaroid Corp. v. Disney*, 862 F.2d 987, 1003 (3d Cir. 1988) (holding that section 14(e) creates an implied right of action to sue when a tender offeror makes material misrepresentations in connection with a tender offer); *Am. Carriers, Inc. v. Baytree Investors, Inc.*, 685 F. Supp. 800, 807 (D. Kan. 1988) (same).  Therefore, the only SEC rules and regulations that apply to this case are those promulgated pursuant to section 13(e) of the Exchange Act.

- 24 -

Notably, issuers must comply with the filing and disclosure requirements set out in Rule 13e-4.[59] Rule 13e-4(f)(8) also contains provisions known as the "all holders" rule, which prohibits discriminatory tender offers by issuers,[60] and the "best price" rule, which requires that all parties to a tender offer receive the highest price paid to any other offeree during the tender.[61]  Failure by the issuer to comply with these requirements may result in enforcement action by the SEC, as well as lawsuits from investors and creditors.

The filing and disclosure requirements of Rule 13e-4, including the all-holders and best-price provisions, become effective at the commencement of the tender offer.  Although the rules in and of themselves are not difficult, their application becomes complicated when it is unclear when or whether a tender offer commenced.  Neither Congress nor the SEC have ever defined the term "tender offer."[62]  In most circumstances, direct application of the Exchange Act and SEC rules can identify the commencement of a tender offer.  Public announcements of a tender

---

[58]   15 U.S.C. § 78m(e)(1).

[59]   *See* 17 C.F.R. § 240.13e-4.

[60]   *Id.* § 240.13e-4(f)(8)(i) (prohibiting tender offers unless "[t]he tender offer is open to all security holders of the class of securities subject to the tender offer"); *but see* Hazen, *supra* note 55, at § 11.8[3] n.109 ("As a matter of state law, Delaware has approved the use of discriminatory tender offers.").

[61]   17 C.F.R. § 240.13e-4(f)(8)(ii) (requiring that "[t]he consideration paid to any security holder for securities tendered in the tender offer [be] the highest consideration paid to any other security holder for securities tendered in the tender offer").

[62]   The SEC proposed, but did not adopt, a definition of "tender offer" in private transactions.  Under the proposed definition, a tender offer was "an offer directed to more than ten persons within a forty-five day period for in excess of 5 percent of the class of securities."   3E Harold S. Bloomenthal & Samuel Wolff, *Securities and Federal Corporate Law* § 25.15 (2d ed. 2001).  At congressional hearings discussing the proposed draft of the Williams Act, the House described a tender offer as follows:
> The offer normally consists of a bid by an individual or group to buy shares of a company usually at a price above the current market price.  Those accepting the offer are said to tender their stock for purchase.  The person making the offer obligates himself to purchase all or a specified portion of the tendered shares if certain specified conditions are met.

H.R. Rep. No. 1711 at 2811 (1968), *cited in Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1206 (2d Cir. 1978).

or exchange offer[63] and the acquisition of more than five percent interest in equity security by a purchaser other than the issuer of the security[64] are recognized indicators of a tender offer. Furthermore, courts have found that "[a] 'classic' tender offer is 'generally defined as a public invitation to a corporation's shareholders to purchase their stock for a specified consideration.' "[65]

But some transactions "fall[] outside the parameters of this 'classic' definition."[66]  As demonstrated in the present case, it can be difficult to discern between a privately-negotiated purchase or exchange of equity security and a tender offer.[67]  For example, a single open-market purchase followed by a formal tender offer may raise questions as to whether the initial purchase was in fact part of the tender—a situation known as a "creeping tender offer."[68]  The nature of that initial open-market purchase becomes significant if, for instance, the initial purchase price was higher than the tender offer.  Because the best price rule requires that all security holders receive the best price offered to any other security holder during the tender offer, whether the initial purchase was part of the tender offer determines whether the parties to the formal tender offer should have received a higher price.

---

[63]  17 C.F.R. § 240.14d-2(a) ("A bidder will have commenced its tender offer . . . when the bidder has first published, sent or given the means to tender to security holders.  For purposes of this section, the means to tender includes the transmittal form or a statement regarding how the transmittal form may be obtained.").

[64]  15 U.S.C. § 78m(d).

[65]  *Am. Carriers, Inc.*, 685 F. Supp. at 809.

[66]  *Id.*

[67]  *See, e.g.*, 15 U.S.C. § 78m(d)(6)(C) (stating that the provision requiring disclosures and filings for acquisitions of more than five percent of a security interest does not apply to "any acquisition of an equity security by the issuer of such security").

[68]  *See Black's Law Dictionary* 26 (9th ed. 2009) (defining a creeping acquisition as "the gradual purchase of a corporation's stock at varying prices on the open market" that "does not involve a formal tender offer, although the SEC may classify it as such for regulatory purposes").  As LSB's counsel informed Jack Golsen, there is no "black-and-white test for what's a tender offer."  Golsen Test., Trial Tr. vol. III (Doc. 194), at 62.

The issue in the present case is similar to the preceding example. If LSB's privately-negotiated purchases of its own equity security constituted a creeping tender offer, the all-holders and best-price provisions of Rule 13e-4 would have required LSB to make the same offer to all preferred shareholders. Rule 13e-4 would then also prohibit LSB from discriminating against Jayhawk as a part of the tender offer. If, however, the individual exchanges were in fact one-off transactions, then LSB was under no obligation to make a formal tender offer. Therefore, the Court must decide whether the transactions between LSB and the individual shareholders were part of a creeping tender offer and thus subject to the Williams Act and Rule 13e-4.

Privately-negotiated transactions with temporal proximity to a tender offer often fall outside the classic definition of a tender offer. Courts agree that whether a private sale is subject to the Williams Act depends on the particular circumstances surrounding the sale. Privately-negotiated transfers of shares can constitute a tender offer if the purchase "interferes with a shareholder's 'unhurried investment decision' and 'fair treatment of . . . investors,' " thereby undermining the intent of the Williams Act.[69] Amidst the courts' highly factual and ad hoc analyses of whether a transaction falls within the purvey of the Williams Act, two tests have emerged.

First, adopting unpublished SEC guidelines on the issue, the courts adopted an eight-factor test to recognize tender offers.[70] Under this test, courts consider the following factors when determining whether a tender offer has commenced: (1) whether there was active and

---

[69]   Hazen, *supra* note 55, at § 11.4.

[70]   *See Wellman v. Dickinson*, 475 F. Supp. 783 (S.D.N.Y. 1979), *aff'd on other grounds*, 682 F.2d 355 (2d Cir. 1982) (first articulating the eight-factor test and repeatedly cited by subsequent courts); *see also Pin v. Texaco, Inc.*, 793 F.2d 1448, 1454 (5th Cir. 1986); *S.E.C. v. Carter Hawley Hale Stores, Inc.*, 760 F.2d 945, 949–52 (9th Cir. 1985); *Energy Ventures, Inc. v. Appalachian Co.*, 587 F. Supp. 734, 740 (D. Del.1984); *Bayly Corp. v. Marantette*, No. 82-1354, 1982 WL 1337, at *15 (D.D.C. Oct. 19, 1982); *In re Cox Radio, Inc. Shareholders Litigation*, No. 4461-VCP, 2010 WL 1806616, at *16–17 (Del. Ch. Jan. 19, 2010).

widespread solicitation of public shareholders, (2) whether the offeror solicited a substantial percentage of the issuer's stock, (3) whether the purchase or exchange offer was made at a better-than-market rate, (4) whether the terms of the offer are firm rather than negotiable, (5) whether the offer is contingent on the tender of a fixed minimum number of shares, (6) whether the offer is open only for a limited period of time, (7) whether the offerees are subject to pressure to sell their stock, and (8) the existence of public announcements of a purchasing program that precede or accompany rapid accumulation of stock.[71]  Every factor need not be present in a transaction to constitute a tender offer—the eight factors are intended to guide the courts' analyses.[72]

The second test of whether a transaction was part of a tender offer is a totality of the circumstances test that simply asks whether, in the absence of the filing requirements of the Williams Act, the offerees will lack the information necessary to make an informed decision about the tender offer.[73]  The Second Circuit introduced this test in the widely-cited case of *Hanson Trust PLC v. SCM Corp.*[74]  In that case, Hanson Trust engaged in five privately-negotiated sales of the plaintiff's stock immediately after Hanson Trust cancelled a formal tender offer[75]  The plaintiff sued to enjoin the private sales to Hanson Trust, arguing that the purchases constituted a de facto tender offer "designed to avoid the strictures of § 14(d) of the Williams Act."[76]  Citing concerns about creating a "mandatory 'litmus test,' " the Second Circuit declined

---

[71]   *See Wellman*, 475 F. Supp. at 823–24; Hazen, *supra* note 55, at § 11.4.

[72]   *Wellman*, 475 F. Supp. at 824 ("[D]epending upon the circumstances involved in the particular case, one or more of the above features may be more compelling and determinative than the others.").

[73]   *See Pin*, 793 F.2d at 1454.

[74]   774 F.2d 47 (2d Cir. 1985).

[75]   *Id.* at 51–53.

[76]   *Id.* at 54.

to apply the eight-factor test and instead took a broader look at the statutory purpose of the Williams Act.[77]  Specifically, the court noted that many of the concerns underlying the enactment of the Williams Act do not apply in situations involving privately-negotiated transactions:

> The number and percentage of stockholders are usually far less than those involved in public offers.  The solicitation involves less publicity than a public tender offer or none.  The solicitees, who are frequently directors, officers or substantial stockholders of the target, are more apt to be sophisticated, inquiring or knowledgeable concerning the target's business, the solicitor's objectives, and the impact of the solicitation on the target's business prospects.  In short, the solicitee in the private transaction is less likely to be pressured, confused, or ill-informed regarding the businesses and decisions at stake than solicitees who are the subjects of a public tender offer.[78]

The Second Circuit therefore held that because the Williams Act was intended to protect ill-informed parties, its application depends on whether a totality of the circumstances indicates a substantial risk that, absent the filing requirements of the Act, the parties to the transaction will lack necessary appraisal information.  Applying that principle to the facts of the case, the court concluded that Hanson Trust's purchases were not part of a tender offer because: (1) there was no active or widespread publicity or public solicitation of shareholders; (2) the sellers were "highly sophisticated professionals, knowledgeable in the market place and well aware of the essential facts needed to exercise their professional skills and to appraise Hanson's offer"; (3) the price did not vary widely from the market price; (4) the purchases were not contingent on sale of a certain percentage of stock; (5) no time limit accompanied the transactions; (6) the sellers were not pressured to sell, and several sellers actually approached Hanson Trust to negotiate a sale;

---

[77]     *Id.* at 57 (citing *S.E.C. v. Ralston Purina Co.*, 346 U.S. 119 (1953), for the proposition that the applicability of the Exchange Act to a given situation should "turn on whether the particular class of persons affected need the protection of the Act").

[78]     *Id.* at 56.

and (7) the number of shareholders involved in the transactions was "miniscule" in light of the total number of SCM investors.[79]

The similarities between these two tests for classifying securities transactions are obvious—most of the factors the Second Circuit actually considered in its "totality of the circumstances" approach are identical to factors first articulated in *Wellman*.[80]   The parallel between the tests shows that certain characteristics are fundamental to a tender offer.   Whether a court adheres to the eight-factor test adopted from the SEC or examines the totality of the circumstances, the key inquiry is whether the privately-negotiated transactions "raise[d] problems that the Williams Act was designed to ameliorate (such as secrecy and high pressure)."[81]

Turning to the transactions in this case and considering the totality of the circumstances, the Court finds that the one-off securities exchanges with individual investors were not part of a tender offer.   First, the evidence clearly shows that LSB did not solicit these exchanges.   Minutes from a Board of Directors meeting held on October 5, 2006, reflect that shareholders Paul Denby and Jim Sight approached LSB and "individually solicited the Company to exchange the Sight Shares and Denby Shares for shares of the Company's common stock . . . at an exchange rate of 7.4 shares of common stock for each share of Series 2 preferred."[82]   Minutes from another board meeting held on October 11, 2006, reflect that four additional groups of shareholders subsequently approached the corporation and asked to complete the same conversion as investors

---

[79]   *Id.* at 58.

[80]   *Compare id.* at 58, *with Wellman*, 475 F. Supp. at 823–24.

[81]   Hazen, *supra* note 55, at § 11.4; *see also Ludlow Corp. v. Tyco Laboratories, Inc.*, 529 F. Supp. 62, 66–68 (D. Mass. 1981) (looking to both the eight-factor test and the purpose of the Williams Act when deciding whether a large-scale, open market securities transaction constituted a tender offer).

[82]   LSB Board Minutes dated Oct. 5, 2006, Def.'s Ex. 470, at 2.

Sight and Denby.[83]   Testimony at trial confirmed that it was the shareholders who approached LSB with the exchange proposal.  LSB's Chief Financial Officer, Tony Shelby, testified: "I would characterize it as it was a proposition that was put to us by one or two shareholders.  We examined the exchange in relation to the price of the stock at that time, and we felt like it was a step in the right direction."[84]  LSB then negotiated an exchange agreement with Sight and Denby, and the Board of Directors then ratified the offer.[85]   Because a corporation's "willingness to negotiate does not amount to solicitation,"[86] the fact that LSB negotiated agreements with the individual investors who solicited exchange offers does not suggest the ensuing transactions were part of a creeping tender offer.[87]

Second, there is no evidence that LSB pressured investors to convert their Series 2 preferred shares to common stock.  In fact, the evidence suggests that the individuals who approached LSB about the exchange were sophisticated and experienced investors.   Grant Donovan, one of Jayhawk's representatives on the LSB Board of Directors, testified: "[W]hen I wanted to really know something about what was going on within the company, some idea of, you know, the market or strategic issues, I would talk to Jimmy Sight.  He seemed to be the one

---

[83]    According to the board minutes, these shareholders included Harold Seidel; Brent Cohen; Brian J. Denby and Mary Denby; Brian Denby, Inc. Profit Sharing Plan; Brian J. Denby, Trustee, Money Purchase Pension Plan; and Stern Brothers & Co.   *See* LSB Board Minutes dated Oct. 11, 2006, Def.'s Ex. 471, at 3.  According to trial testimony, the numerous Denby accounts were the result of Mr. Denby purchasing preferred shares in his family's name, and in various trusts.  Trial Tr. vol. III (Doc. 194), at 61.  For purposes of the Board's resolutions, those shares related to Brian Denby were grouped together and collectively referred to as "Brian J. Denby and affiliates."  LSB Board Minutes dated Oct. 11, 2006, Def.'s Ex. 471, at 3–5.

[84]    Shelby Test., Trial Tr. vol. III (Doc. 194), at 197.

[85]    Donovan Test., Trial Tr. vol. II (Doc. 193), at 16, 170.

[86]    *Crane Co. v. Harsco Corp.*, 511 F. Supp. 294, 303 (D. Del. 1981).

[87]    *See, e.g.*, *Ludlow Corp.*, 529 F. Supp. at 68 (finding that a company did not solicit tender offers when the shareholders, rather than the defendant, "initiated negotiations for the sale of the stock"); *cf. Cattlemen's Inv. Co. v. Fears*, 343 F. Supp. 1248, 1251–52 (W.D. Okla. 1972) (finding that a defendant "deprived shareholders of information . . . material to their investment decisions" when it engaged in "an active and widespread solicitation of public shareholders in person, over the phone and through the mails").

that knew the most about what was going on with the company."[88]  If anything, the evidence suggests that Sight and Denby pressured LSB into accepting their offer to exchange preferred stock for common.

Third, although the exchange amount of preferred to common stock—7.4 shares of common stock per share of preferred stock—was greater than the rate enumerated in the Certificate of Designation, there is no evidence that LSB used this advantageous exchange rate to encourage investors to convert their stock.  In fact, LSB understood that it was giving investors a deal, but agreed to the terms of the exchange because it would eliminate the preferred shares and dividend arrearages without requiring LSB to make a cash payment.[89]  Plaintiff's expert, economist Scott Hakala, testified that it is not uncommon for companies to convert preferred stock to common at a higher exchange rate to eliminate overhang from unpaid cumulative dividends.[90]  According to Hakala, the preferred shares were a detriment to LSB:

> The Series 2 Preferred have additional rights, and also the company is restricted from engaging in certain types of transactions.  It's restricted from purchasing, acquiring, or redeeming common shares or any other junior stock.  It's prohibited from performing certain other transactions without the approval of the Series 2 Preferred.  And, additionally, this overhang creates a cash obligation in the case of a liquidation or wind-up of a company.  If you convert it to common equity from the prospective [sic] of the lenders, and from the prospective [sic] of people who want to lend money to the company, the borrowing costs would go down because those cumulative unpaid dividends and that liquidation preference would go away and, therefore, the lender would view the company as being less leveraged, more financially solvent.[91]

---

[88]   Donovan Test., Trial Tr. vol. II (Doc. 193), at 13.

[89]   *See* Donovan Test., Trial Tr. vol. II (Doc. 193), at 12 (Plaintiff's witness Grant Donovan, a member of the LSB Board of Directors, testified that the exchanges were "a very positive thing to have happen" because investors were unlikely to express interest in LSB so long as "they were in default under a provision of these preferred shares."); Shelby Test., Trial Tr. vol. III (Doc. 194), at 198 ("It was an exchange that seemed to make good economic sense to us at the time.").

[90]   Hakala Test., Trial Tr. vol. II (Doc. 193), at 89.

[91]   *Id.* at 93–94.

Furthermore, LSB's board of directors unanimously found that neither Sight nor Denby received any remuneration for soliciting the exchange agreement.[92]  Instead, the investors who converted received an advantageous exchange rate and a more secure investment in common stock.[93]

Fourth, the number of shares LSB exchanged constituted a small portion of the total outstanding Series 2 preferred shares.  According to filings with the SEC, a total of 104,548 shares, or 17% of the outstanding preferred shares, were exchanged in these individual transactions.[94]  Courts have found that exchanges amounting to greater percentages of total stock were not part of a tender offer.[95]  Although the transactions in those cases involved a large percentage of the companies' securities, commentators note that the cases "did not involve a hostile, high pressure move to take control such that the interests of investor protection called for section 14(d)'s advance notice and filing requirements."[96]  Similarly, as discussed above, there is no evidence that LSB's investors needed to be protected from any hostile pressure to convert their shares.  As such, the exchanged shares do not constitute a significant portion of LSB's securities.  Moreover, there is no evidence that the exchanges with the individual investors were

---

[92]   LSB Board Minutes dated Oct. 5, 2006, Def.'s Ex. 470, at 3.

[93]   *See* Golsen Test., Trial Tr. vol. III (Doc. 194), at 53 (discussing a conversation with Sight and Denby in which the two investors confided that they could have problems using the preferred shares as collateral if the stock continued "bouncing around," but that "they could use that common [stock] to shore up [their] position with the banks").

[94]   LSB's SEC filings state that it exchanged a total of 104,548 preferred shares, leaving 499,102 shares outstanding at the time LSB and Jayhawk entered the Exchange Agreement.  LSB's 2006 SEC Form 10-K Pls.' Ex. 81, at 34–35.  Accordingly, prior to the individual exchanges, 603,650 shares of LSB Series 2 preferred shares were outstanding.  *Cf.* Def.'s Proposed Finding of Facts & Conclusions of Law (Doc. 197), at ¶ 21 (stating that LSB exchanged 104,548 of 603,648 shares).   Using the numbers presented in the stipulated exhibit, the individual exchanges constituted 17.3% of LSB's outstanding preferred shares.

[95]   *See, e.g.*, *Hanson Trust*, 774 F.2d at 57 (holding that "five private purchases and one open market purchase of SCM shares, totalling [sic] 25% of SCM's outstanding stock, did not under the circumstances constitute a 'tender offer' within the meaning of the Williams Act"); *Carter Hawley*, 760 F.2d at 947 (finding no tender offer occurred despite the fact that the company repurchased almost fifty percent of its outstanding common stock within a one-week period).

[96]   Hazen, *supra* note 55, at § 11.4.

contingent on the exchange of a fixed number of shares such that the investors would feel pressured to exchange more shares.

Finally, other than publication of board minutes, there is no evidence that LSB made a public announcement of the exchanges until LSB decided to make a formal tender offer. Reviewing cases in which privately negotiated stock exchanges and purchases occurred in close proximity to a public announcement of a tender offer, it is clear that the timing and sequence of events is important to the ultimate consideration of whether investors felt pressured to participate in the transaction.  Coercion is a greater concern when individual transfers follow a public announcement of a tender offer, and courts have been more likely to associate subsequent one-off transactions with the tender offer that was previously announced.[97]  In contrast, the public announcement in the case occurred after the individual exchanges.

As demonstrated in the foregoing analysis, there is no evidence that the Series 2 Preferred shareholders—the persons affected by the transactions—required the protections provided by the notice and filing provisions of the Williams Act.[98]  The individuals who participated in the early transactions were highly sophisticated investors who approached LSB with the exchange proposal; there is no evidence to suggest they felt pressured or uninformed at the time of the transactions.  Because the individual exchanges with preferred shareholders did not constitute a tender offer the best-price and all-holders provisions of Rule 13e-4 of the Williams Act were inapplicable at the time those transactions occurred.  For that reason, LSB was not obligated to go forward with the March 2007 exchange offer.

---

[97]   *See, e.g.*, *Field v. Trump*, 850 F.2d 938 (2d Cir. 1988) (holding that a privately-negotiated stock purchase that occurred between the withdrawal of one tender offer and the announcement of another was part of a single tender offer).

[98]   *See Hanson Trust*, 774 F.2d at 57 (citing *Ralston Purina Co.*, 346 U.S. at 125).

### b.    LSB was not required to treat all of the preferred shareholders alike during the exchange offer.

Because the individual exchange transactions did not constitute a creeping tender offer, LSB was not required to make a formal exchange offer to the Series 2 Preferred shareholders. LSB was therefore free to condition the March 2007 exchange offer on Jayhawk's acquiescence to the terms of the Exchange Agreement, provided that the Exchange Agreement did not violate any laws or fiduciary duties by treating Jayhawk and Golsen differently than the other Series 2 Preferred shareholders.

Jayhawk's argument, although somewhat disjointed in its brief, seems to be that LSB breached a fiduciary duty of loyalty by discriminating against Jayhawk during the exchange. Jayhawk argues that corporations are not permitted to treat a single shareholder differently than the others.  As support for this proposition, Jayhawk cites cases stating that "all shares of the same type, series, or class are, by definition, equal" and, thus, are "equally entitled to share in the profits of the corporation."[99]

LSB does not dispute the principles Jayhawk espouses, but adds that the preferential rights of preferred shareholders, unlike the rights of common stockholders, are not guaranteed to the preferred shareholders in law or equity.  Instead, LSB argues, preferential rights—such as the ability to convert preferred shares to common stock—are contractual in nature and limited in scope to those terms written in the certificate of designation.[100]  In other words, LSB argues that a

---

[99]    Pls.' Proposed Findings of Fact & Conclusions of Law, Doc. 198, p. 13 (quoting *In re Sea-Land Corp. Shareholders Litig.*, 642 A. 2d 792, 799 (Del. Ch. 1993) and also citing *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584, 593 (Del. Ch. 1986) ("At common law and in the absence of an agreement to the contrary all shares of stock are equal.")).

[100]    *See Matulich v. Aegis Communications Group, Inc.*, 942 A.2d 596, 600 (Del. 2008) ("[T]he special rights and limitations of preferred stock are created by the corporate charter or a certificate of designation, which acts as an amendment to a certificate of incorporation.  Consequently rights of preferred shareholders are primarily contractual in nature.").

preferred shareholder is entitled only to those rights that are either (1) shared equally between preferred shareholders and common stockholders, such as standing to bring a derivative claim; or (2) expressly provided for in the parties' certificate of designation. LSB contends that the Certificate of Designation for the Series 2 Preferred Shares does not include any provisions requiring equal treatment of all shareholders, and argues that "[n]either of the cases cited by Jayhawk stand for the proposition that the right to exchange preferred shares into common stock is not a preference but is a right shared equally with common shareholders."[101] The Court agrees with LSB's analysis.

### (i)     Delaware law permits disparate treatment of shareholders during tender offers.

First, the Court finds no support in law or equity for the proposition that a corporation is required to treat all shareholders equally. The corporate fiduciary duties of care and loyalty stem from the principle that "[t]he board of directors has the ultimate responsibility for managing the business and affairs of a corporation."[102] Additionally, the Delaware Code grants corporations broad authority in dealing with its own stock.[103] Combining these two principles, Delaware courts have found that "it is now well established that in the acquisition of its shares a Delaware corporation may deal selectively with its stockholders, provided the directors have not acted out

---

[101]    Def.'s Response Brief, Doc. 199, p. 7. LSB also correctly notes that Jayhawk did not set forth a faithful representation of *Jedwab v. MGM Grand Hotels, Inc.*, 509 A.2d 584 (Del. Ch. 1986). Reading past the introductory principle that Jayhawk cites, that case in fact holds that "with respect to matters relating to preferences or limitations that distinguish preferred stock from common," such as the ability of preferred shareholders to convert their preferred shares to common stock, "the duty of the corporation and its directors is essentially contractual." *Id.* at 594.

[102]    *Ivanhoe Partners v. Newmont Min. Corp.*, 535 A.2d 1334, 1341 (Del. 1987) (citing 8 Del. C. § 141(a) (1983)).

[103]    *See* 8 Del. C. § 160(a) ("Every corporation may purchase, redeem, receive, take or otherwise acquire, own and hold, sell, lend, exchange, transfer or otherwise dispose of, pledge, use and otherwise deal in and with its own shares . . . .").

of a sole or primary purpose to entrench themselves in office."[104]   Rather than requiring equal treatment of all shareholders, courts review a corporation's actions on an ad hoc basis and apply the business judgment rule to determine whether the corporation's directors acted in furtherance of the best interests of the corporation.[105]

The seminal case examining a board's disparate treatment of shareholders is *Unocal Corporation v. Mesa Petroleum Co.*[106]   In that case, the plaintiff-shareholder, who owned approximately 13% of the defendant-corporation's stock initiated a cash tender offer for 38% of the corporation's stock.[107]   The plaintiff would then have control of 51% of the corporation's outstanding common stock, and could take over the company by eliminating the remaining 49% of the stock through various exchanges of junk bonds.   The corporation's board of directors, on the advice of expert analysts, concluded that the plaintiff's offer was not in the corporation's best interest and decided to take defensive action.   The corporation passed a resolution saying that if the plaintiff acquired 51% of the stock, the corporation would commence a self-tender and purchase the remaining 49% at a fair market value.   The self-tender excluded any shares held by the plaintiff.   The plaintiff sued for injunctive relief, arguing that the corporation could not engage in a tender offer that discriminated against an individual shareholder.[108]

The Delaware Supreme Court applied the business judgment rule to the board's actions and found that the corporation's actions were reasonable.   The court held that a selective tender offer is valid if the issuing corporation is attempting to either defeat or diminish the adverse

---

[104]   *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 953–54 (Del. 1985) (citations omitted).

[105]   *Id.* at 954–55.

[106]   493 A.2d 946 (Del. 1985).

[107]   *Id.* at 949.

[108]   *Id.* at 949–52.

effects of an inadequate and hostile tender offer from a shareholder.  The court specifically noted that the tender offer in *Unocal* was not inequitable towards the plaintiff-shareholder because (1) the plaintiff's participation in the self-tender would exacerbate the hostile takeover, (2) the plaintiff did not fit within the class of shareholders being protected from the original, coercive tender offer, and (3) the exchange offer was fair because it protected the value of the minority shareholders' assets in the corporation.[109]

Delaware courts adopted the "*Unocal* standard" as a heightened form of the business judgment rule that applies in situations where a corporation's board of directors acted in response to a hostile threat against the corporation.[110]  Rather than presuming that the board acted appropriately, as courts usually do under the business judgment rule, courts applying the *Unocal* standard must make additional inquiries to ensure that the board is not acting primarily in its own interests, but rather in the best interests of the corporation and its shareholders.[111]  Specifically, the corporation must show that "(1) it had reasonable grounds for believing that a danger to corporate policy and effectiveness existed; and (2) its defensive response was proportional to the threat posed."[112]  If, under the court's heightened scrutiny, the board "can prove that its actions were justified, the business judgment rule remains in effect" and the corporation's actions should be deemed reasonable.[113]

The very fact that Delaware permits disparate treatment of shareholders during tender offers discredits Jayhawk's argument that LSB was required to treat all shareholders alike during

---

[109]   *Id.* at 956–57.

[110]   3A Fletcher, *supra* note 31, at § 1041.40.

[111]   *See Unocal*, 493 A.2d at 954; *Solomon v. Armstrong*, 747 A.2d 1098, 1112 (Del. Ch. 1999).

[112]   3A Fletcher, *supra* note 31, at § 1041.40.

[113]   *Solomon*, 747 A.2d at 1112.

the March 2007 exchange offer.  Moreover, an argument could be made that Jayhawk posed a threat to LSB that was significant enough to meet the *Unocal* standard.  Jayhawk and Kent McCarthy owned a majority of LSB's preferred shares, and permitting them to exchange all of those shares at the 7.4 ratio would not only dilute the outstanding common stock, but would also grant McCarthy more control over LSB's business decisions.  Testimony from LSB employees, including CEO Jack Golsen, made clear that LSB was concerned about and did not agree with McCarthy's views on LSB's operations.[114]  For example, the Court heard testimony from several witnesses regarding a conference call in 2006 between LSB's officials and an analyst that the public—including LSB's shareholders, lenders, creditors, competitors, and employees—were permitted to listen in on.[115]  According to testimony, Kent McCarthy got on the phone and "hogged almost the whole call."[116]  Those listening on the call said McCarthy was "wild" and "pretty critical of management."[117]  According to Golsen, "[McCarthy] virtually called us idiots, didn't know what we were doing, we were unsophisticated . . . .  He raised his tone of voice, and the way he conducted himself shocked us all."[118]

As a result of McCarthy's behavior, LSB was concerned about the corporation's future relationships with those who participated in the conference call.[119]  LSB's Chief Financial Officer, Tony Shelby, testified that he was concerned that McCarthy "might have given the

---

[114]  *See, e.g.*, Golsen Test. Trial Tr. vol. III (Doc. 194), at 25–30 (describing McCarthy's criticisms of LSB and his persistent calls to the company and its subsidiaries in which he offered unsolicited advice that contradicted Golsen's goals for the company).

[115]  *Id. at* 31–32; Shelby Test. Trial Tr. vol. III (Doc. 194), at 181.

[116]  Golsen Test., Trial Tr. vol. III (Doc. 194), at 32.

[117]  *Id.*; Shelby Test. Trial Tr. vol. III (Doc. 194), at 182.

[118]  Golsen Test., Trial Tr. vol. III (Doc. 194), at 32.

[119]  *Id.* at 35–36; Shelby Test. Trial Tr. vol. III (Doc. 194), at 182–83 ("[W]e have lenders that are on that call, we have suppliers, we have employees, we have . . . a lot of people that listen to that call, so it was a little bit disconcerting to have a large shareholder like that sort of lay out the dirty laundry the way he viewed it.").

impression to some of our stakeholders, such as our employees, lenders, suppliers and customers, that he may have some designs on maybe being influential on management, and . . . that he might be creating some control issues with respect to who controls this business."[120]   In fact, one of LSB's lenders called after the conference call to express concern about whether McCarthy was in charge of the company.[121]   Because LSB was in the process of negotiating contracts with customers and applying for loans with banks, the corporation needed to portray itself as stable and capable of performing on the contracts it was negotiating.[122]   McCarthy's public criticism of LSB in front of the very people LSB needed to impress was thus a problem for LSB.   It is no surprise, then, that Golsen testified:

> I was not ready to turn the control of the company over to him or have him get any deeper into the company because I didn't think it was good for the company, it wasn't good for our shareholders, and it wasn't good for our employees and it wasn't—just wasn't good.   I had come to that conclusion, business conclusion.[123]

The Court concludes that LSB could reasonably believe that permitting Jayhawk to exchange all of its preferred shares to common stock would give McCarthy an amount of control over LSB that could prove detrimental to the company in the future.   LSB's solution—permitting Jayhawk to exchange only half of its preferred shares—was a proportional response that was profitable for Jayhawk and did not disrupt LSB's corporate structure.   Furthermore, there is no evidence that Golsen or any other directors entered the Exchange Agreement with the intent to elicit personal gain.   Golsen, another large preferred shareholder, also agreed to only tender half of his shares, and later suggested the August 2007 redemption of the outstanding preferred shares

---

[120]   Shelby Test. Trial Tr. vol. III (Doc. 194), at 183.

[121]   Golsen Test., Trial Tr. vol. III (Doc. 194), at 35–36.

[122]   *See* Shelby Test. Trial Tr. vol. III (Doc. 194), at 186.

[123]   Golsen Test., Trial Tr. vol. III (Doc. 194), at 64–65.

as a way to protect the common stockholders.[124]   Therefore, LSB's decision to treat Jayhawk differently than other preferred shareholders during the exchange offer was a reasonable under the business judgment rule, and thus did not constitute a breach of fiduciary duty.

   *(ii)*  **The "best price rule" does not prohibit a corporation from limiting the number of shares an individual may tender.**

Furthermore, Jayhawk's argument that the best-price rule promulgated by the SEC requires shareholders to be treated exactly the same during a tender offer is a misstatement of the rule.  The best-price provision of Rule 13e-4—the rule that governs tender offers by issuers of securities[125]—requires only that "[t]he consideration paid to any security holder *for securities tendered* in the tender offer is the highest consideration paid to any other security holder for securities tendered in the tender offer."[126]  LSB permitted Jayhawk to exchange its shares at the same rate as the other Series 2 Preferred shareholders; what LSB regulated was the number of shares Jayhawk could exchange.  The plain language of Rule 13e-4 requires that all shareholders receive the same consideration for the shares exchanged, but it does not require that all shareholders be permitted to exchange the same number of shares.[127]  Therefore, LSB did not violate the best-price rule by prohibiting Jayhawk from exchanging all of its shares in the March 2007 exchange offer.

   *(iii)*  **The Certificate of Designation does not guarantee preferred shareholders equal treatment in all transactions.**

---

[124] *Id.* at 94 ("And I said [to McCarthy], 'Yeah, and we've got to be very careful that we don't do anything to take advantage of the common shareholders.' ").

[125] Jayhawk cites to Regulation 14d-10 when discussing the best price rule.  Regulation 14d, however, applies only to transactions covered by section 14(d) of the Exchange Act.  As noted *supra* in note 57, section 14(d) does not apply to the March 2007 exchange offer because LSB, the issuer of the security, was the tender offeror. *See* 15 U.S.C. § 78n-d(8)(B) ("The provisions of this subsection [section 14(d)] shall not apply to any offer for, or request or invitation for tenders of any security . . . by the issuer of such security . . . .").

[126] 17 C.F.R. § 240.13e-4(f)(10)(ii) (emphasis added).

[127] *See id.*

Finally, the Court rejects Jayhawk's argument that the Certificate of Designation required LSB to treat all Series 2 Preferred shareholders equally because "the Certificate requires that preferred shareholders be treated on a 'pro rata' basis."[128]  The Certificate requires the pro rata payment of declared dividends.  LSB never declared a dividend in the time period at issue in this case, so that provision of the Certificate is inapplicable.  And the Court will not infer from one reference to pro rata payments that LSB intended the Certificate to require equal treatment in all dealings with shareholders.  Therefore, the Court finds that the Certificate of Designation did not guarantee Jayhawk the right to convert an equal number of preferred shares as the other Series 2 Preferred shareholders.

In conclusion, the Court finds no legal or contractual requirement that LSB had to permit all preferred shareholders to exchange equal amounts of preferred shares during the March 2007 exchange offer.  Accordingly, the Exchange Agreement is legal, and LSB's board of directors did not breach any laws or fiduciary duties when it conditioned the exchange offer on Jayhawk's acquiescence to the terms of the Exchange Agreement.  The Court has found that neither the Securities and Exchange Act nor the SEC's rules and regulations required LSB to make a formal tender offer in the wake of the one-off exchanges with shareholders.  Absent such requirement, and in light of LSB's adamant assertions that it would not have exchanged any shares beyond the one-off transactions if Jayhawk did not agree to exchange only half its preferred shares,[129] Jayhawk cannot prove that it was damaged as a result of LSB's alleged misrepresentations about the NOL.  The lynchpin of Jayhawk's claims is the assertion that it would not have entered the Exchange Agreement if LSB had not misrepresented the state of the company's NOL.  But if

---

[128]   Pls.' Proposed Findings of Fact & Conclusions of Law, Doc. 198, p. 13.

[129]   *See* Golsen Test., Trial Tr. vol. III (Doc. 194), at 96 ("I would not have done a deal.  I would rather have had no deal than allow him to exchange all his shares.  I would have voted against it.  I believe that my board would have voted with me.").

Jayhawk did not enter the Exchange Agreement, LSB would not have consummated the exchange offer and Jayhawk would not have exchanged any shares at all.  As McCarthy apparently reasoned when entering the Exchange Agreement, half a loaf of bread is better than nothing at all.[130]   Therefore, even assuming that LSB did misrepresent the status of the NOL, Jayhawk cannot prove that LSB's falsehood caused any damages.  For that reason, Jayhawk cannot prevail on any claims that require proof of damages—namely, its claims for relief on the grounds of fraudulent inducement, fraud, section 10(b) and Kan. Stat. Ann. § 17-12a501 violations, and breach of fiduciary duty.[131]

## C.    Breach of Contract Regarding Dividend Payments

Jayhawk's last remaining claim alleges that LSB breached the terms of the Certificate of Designation when LSB refused Jayhawk dividend payments when Jayhawk converted their remaining preferred shares in August 2007.  The parties' arguments focus on three specific provisions of the Certificate: sections 3(a), 5, and 6(c).  "The construction of preferred stock provisions are matters of contract interpretation for the courts."[132]  Under Kanas law, if the terms of the contract are plain on their face, then "there is no room for rules of construction, and the intent of the parties is determined from the contract itself."[133]  Although the Certificate in this case is no model of clarity, for the reasons set forth below, the Court finds that the plain language of the contract shows that LSB did not breach the terms of the Certificate regarding the payment of dividends.

---

[130]   *See* McCarthy Test., Trial Tr. vol. I (Doc. 192), at 184 (reciting a statement McCarthy made about the March 2007 exchange offer during a deposition in another matter).

[131]   *See supra*, n.50 (setting out precedent for the damages requirement in each of these claims).

[132]   *Matulich*, 942 A.2d at 600.

[133]   *Liggatt v. Employers Mut. Cas. Co.*, 46 P.3d 1120, 1125 (Kan. 2002).

First, section 3(a) explains the accrual and record dates for dividend payments. Specifically, that section says: "The holders of Convertible Exchangeable Preferred Stock shall be entitled to receive, *when, as and if declared by the Board* out of funds at the time legally available therefor, dividends . . . ."[134]  Dividend due dates occur quarterly on the fifteenth of June, September, December, and March.  Dividends are paid to the holder of record as of the record date, which is "not more than 60 nor less than 10 days preceding each Dividend Due Date *as is fixed by the Board*."[135]  Jayhawk's arguments regarding this section of the Certificate focus on a provision that says declared cash dividends of an amount less than the total accumulated amount "shall be allocated pro rata among all [Series 2 Preferred] shares."[136]  Extrapolating from this provision, Jayhawk contends that LSB is in breach because Jayhawk was treated unequally in that it was the only preferred shareholder that did not receive a dividend payment for all of its preferred shares.

A closer reading of the Certificate shows that Jayhawk was not entitled to any dividends at the time it converted its shares.  As provided in section 3, the board must first declare a dividend and set a record date before any shareholder may receive a dividend.  It is undisputed that the board never formally resolved to declare a dividend or set record dates in connection with the redemption.  Therefore, LSB did not breach section 3(a) of the Certificate.

Second, section 5 sets out the terms for redemption of the Series 2 Preferred Shares. According to the Certificate, LSB could redeem the Series 2 Preferred Shares for "$50.00 per share, plus, in each case, an amount in cash equal to all dividends on the [Series 2 Preferred

---

[134]   Certificate of Designation, Pls.' Ex. 32, p. 3, § 3(a) (emphasis added).

[135]   *Id.* (emphasis added).

[136]   *Id.*

Shares] accrued and unpaid thereon, whether or not declared."[137]  Jayhawk first argues that the redemption constituted a de facto declaration of a dividend.  And arguing in the negative, Jayhawk alleges that LSB breached the contract when it declined to pay dividends to converting shareholders like Jayhawk because "paragraph 5 [of the Certificate] describing the redemption procedure does not state that the dividends owed upon redemption 'whether or not declared' are *not* payable if the holder elects the conversion option under the redemption procedures."[138]

Jayhawk's arguments misstate the redemption language in the Certificate.  Section 5 does not say that *dividends* are payable to the preferred shareholders upon redemption.  It says that LSB must pay "*an amount in cash* equal to all dividends . . . accrued and unpaid thereon, whether or not declared."[139]  A cash payment equal to a dividend is not the legal equivalent of corporate action declaring a dividend.[140]  A corporation does not owe preferred shareholders any rights that are neither shared equally with common stockholders nor set out in the certificate of designation.[141]  Jayhawk does not contend that the payment of dividends was a right shared by the common stockholders, and, as evidenced by its argument in the negative, Jayhawk does not dispute that the Certificate does not require LSB to pay dividends upon conversion.  Therefore, LSB could not possibly breach a contract by not performing an action it was never obligated to perform.

---

[137]  *Id.* at 5–6, § 5.

[138]  Pls.' Proposed Findings of Fact & Conclusions of Law, Doc. 198, p. 4 (emphasis added).

[139]  Certificate of Designation, Pls.' Ex. 32, p. 6, § 5 (emphasis added).

[140]  *See, e.g.*, *Mann-Paller Found., Inc. v. Econometric Research, Inc.*, 644 F. Supp. 92, 96 (D.D.C. 1986) (applying Delaware law and holding that the IRS's characterization of corporate distributions as dividends for tax purposes does not also characterize those payments as *de facto* dividends requiring further distribution from the corporation).

[141]  *See Jedwab*, 509 A.2d at 594 (stating that rights shared equally with common stockholders are governed by principles of law and equity, but preferential rights are contractual in nature).

Finally, section 6 of the Certificate governs shareholders' rights to convert preferred shares to common stock.  The Certificate appears to state that a shareholder that converts its preferred shares is not entitled to payment of the accrued dividends.  An exception to this rule is found in section 6(c) which begins by describing the factual circumstances triggering the exception as "the case of any share of Convertible Exchangeable Preferred Stock which is surrendered for conversion after any record date established by the Board with respect to the payment of a dividend . . . and on or prior to the opening of business on the next succeeding Dividend Due Date."[142]  Therefore, exception in section 6(c) applies only to shares converted in the limited time between the dividend record date—which, according to section 3(a), is set by the Board after it declares a dividend—and the next dividend due date.  Because LSB's board did not declare a dividend, no record date existed at the time Jayhawk converted its remaining shares.  Therefore, the exception in section 6(c) is inapplicable here.  Instead, Jayhawk falls within the purview of the final sentence of section 6(c): "Except as provided in this paragraph, no payment or adjustment shall be made upon any conversion on account of any dividends accrued on shares of [Series 2 Preferred Shares] surrendered for conversion or on account of any dividends on the Common Stock issued upon conversion."[143]  In other words, because Jayhawk did not surrender its shares for conversion after a dividend record date, it was not entitled to payment for any accrued dividends.  Accordingly, LSB did not breach section 6, or any other provision, of the Certificate.

---

[142]   Certificate of Designation, Pls.' Ex. 32, p. 9, § 6(c).

[143]   *Id.* at 9–10, § 6(c).

D.      **Settlement of the Jayhawk's Claims**

The last claim the parties discuss is LSB's contention that this entire matter was settled in 2008 when the parties were negotiating a settlement for KU's suit against LSB. The parties dispute whether the laws of Texas or Kansas apply to that claim, but the Court need not address conflict of laws because under either state's law, LSB's argument lacks merit.[144] A settlement agreement is a contract, and for that reason, parties must mutually assent to the terms of the agreement.[145] "When the evidence pertaining to the existence of a contract or the content of its terms is conflicting or permits more than one inference, a question of fact is presented."[146]

In the present case, LSB and Jayhawk presented diametrically opposed evidence as to whether the parties settled the present claims. Bruce Collins, representing LSB, testified that Jim McMullen represented himself as having authority to settle prospective claims from Jayhawk and proposed the alleged settlement agreement. McMullen countered that Jayhawk had not even threatened suit at the time the two attorneys spoke, and therefore, McMullen never proposed a settlement agreement involving Jayhawk. Reviewing the e-mails exchanged between McMullen

---

[144] A federal court hearing a case in diversity applies federal procedural law and state substantive law. *See Gasperini v. Ctr. for Humanities, Inc.*, 518 U.S. 415, 427 (1996). Rule 11 of the Texas Rules of Civil Procedure states that settlement agreements are invalid unless they are authorized in writing and either filed with the court or made on the record. If Rule 11 is a substantive rule of Texas law applicable in the case, the parties here did not have an enforceable settlement because they never filed an authorized, written agreement with the Court. Texas courts, however, have declined to characterize the nature of Rule 11. *See, e.g., White Farm Equipment Co. v. Kupcho*, 792 F.2d 526, 529 (5th Cir. 1986) ("We need not decide whether [Rule 11] is substantive or procedural, however, because the parties concede that the settlement agreement was made in open court and read into the record and is therefore enforceable under the Rule."); *Kennedy v. Hyde*, 682 S.W.2d 525, 529 (Tex. 1984) ("In this case, however, the issue is easily resolved without addressing such thorny questions in detail."). Because this Court finds a lack of mutual consent to settle between LSB and Jayhawk, the Court will similarly decline to wade into the quagmire of the "substantive" versus "procedural" distinction.

[145] *See, e.g., Nungesser v. Bryant*, 153 P.3d 1277 (Kan. 2007) ("Ample Kansas case law supports the hornbook proposition that an unconditional and positive acceptance is required to form a contract; a conditional acceptance of a settlement offer is but a counteroffer, which does not create a contract."); *Nat'l Cas. Co. v. Lane Exp., Inc.*, 998 S.W.2d 256, 262 (Tex. Ct. App. 1999) ("The law of contracts is applicable to settlement agreements. Mutual assent is a fundamental essential of every contract." (Internal citation omitted)).

[146] *Nungesser*, 153 P.3d at 1288; *see also Ward v. Ladner*, 322 S.W.3d 692, 698–99 (Tex. Ct. App. 2010) (stating that "[w]hether an oral contract existed is a question of fact" and that "it is within the finder of fact's province to resolve conflicts in the evidence").

and LSB's attorneys, there is no evidence—other than Collins's assertions—that McMullen proposed or accepted the terms of the agreement contained in the e-mails.  Furthermore, the Court is dubious of LSB's contention that Jayhawk was willing to settle a $12 million lawsuit for $100,000.  Consequently, the Court finds that the parties did not previously settle this lawsuit.

**IT IS ACCORDINGLY ORDERED** this 19th day of September, 2012, that judgment should be entered in favor of Defendant LSB Industries, Inc.

**IT IS SO ORDERED**.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE